130 F.3d 1193
 75 Fair Empl.Prac.Cas. (BNA) 1011,
72 Empl. Prac. Dec. P 45,097
Marilyn L. HUDSON, Plaintiff-Appellant,
v.
Janet RENO, Attorney General of the United States, and
United States Department of Justice, Defendants-Appellees.
 No. 96-5232.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 8, 1997.
Decided Dec. 4, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied March 10, 1998.
 
 1
 David H. Shapiro (argued and briefed), Swick & Shapiro, Washington, DC, Arthur J. Andrews (briefed), Andrews, Hudson & Wall, Knoxville, TN, for Plaintiff-Appellant.
 
 
 2
 Mark W. Pennak (argued and briefed), Michael Jay Singer (briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Defendants-Appellees.
 
 
 3
 Before: KRUPANSKY and SUHRHEINRICH, Circuit Judges; ROSEN, District Judge.*
 
 OPINION
 
 4
 ROSEN, District Judge.
 
 
 5
 Plaintiff-Appellant Marilyn L. Hudson appeals several rulings of the United States District Court for the Eastern District of Tennessee in her Title VII sex discrimination action. For the reasons stated herein, we affirm.
 
 I. INTRODUCTION
 
 6
 Plaintiff-Appellant Marilyn Hudson, a former Assistant United States Attorney ("AUSA") brought this action in the District Court alleging that her superiors in the United States Attorney's office in the Eastern District of Tennessee (1) engaged in sex discrimination and retaliation against her in her employment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. and the Equal Pay Act, 29 U.S.C. § 206(d), and (2) violated her rights under the Privacy Act, 5 U.S.C. § 552a. The Privacy Act, Equal Pay Act and pre-November 20, 1991 Title VII claims[1] were tried to the court, while a jury decided the post-November 20, 1991 Title VII claims.
 
 
 7
 The District Court found in favor of the Defendants on the Privacy Act, Equal Pay Act and pre-1991 Title VII claims. With respect to Hudson's post-November 20, 1991 claims, the jury found Defendants liable for sex discrimination, retaliation and constructive discharge and awarded Hudson $250,000 in compensatory damages for sex discrimination; $500,000 in compensatory damages for retaliation; and $750,000 in compensatory damages arising from the constructive discharge, for a total award of $1.5 million. The District Court, however, capped all of these damages at $300,000 pursuant to the damages caps in 42 U.S.C. § 1981a. The court also determined that reinstatement was not a viable option, but refused to award Plaintiff front pay, finding that Hudson had immediately gone into private practice after leaving the U.S. Attorney's office and that there was no financial detriment as a result of her change in employment. Thereafter, the court awarded Hudson $430,752.28 in attorney fees and costs.
 
 
 8
 Hudson now appeals the District Court's rulings with respect to the compensatory damages cap; the refusal to award her front pay; her Privacy Act claim; and the attorneys' fee award.
 
 II. FACTUAL AND PROCEDURAL BACKGROUND
 
 9
 Plaintiff Marilyn Hudson was hired as an AUSA on March 7, 1983 by John W. Gill, Jr., who was, at the time, the United States Attorney for the Eastern District of Tennessee. In 1986 and 1987, Gill rated Hudson's work "excellent", and in 1988, he rated her "outstanding." Gill subsequently promoted Hudson to the position of Chief of the Financial Litigation Unit in February 1989, and then, in November 1989, he promoted her to Chief of the Civil Division. During this same time period, Gill also promoted James R. Dedrick, who was hired as an AUSA the same time as Plaintiff, to First Assistant U.S. Attorney, the second-in-command position.
 
 
 10
 Between February 1989 and April 1990, Gill rated Hudson's supervisory performance as "outstanding". Thereafter, however, Gill became dissatisfied with Plaintiff's performance. Specifically, he identified several managerial and personnel problems, including: failing to complete personnel paperwork in a timely fashion, despite repeated requests; failing to complete her budgetary plan diligently; failing to comply with the Office's plan for purging old files, including falsely certifying that the Civil Division was in compliance; and shortcomings in her management of staff and distribution of work.
 
 
 11
 In January 1991, Gill recommended three of his male supervisors to the Executive Office for the United States Attorneys ("EOUSA") for salary increases. However, he declined to recommend Plaintiff, a female, and one other male AUSA because of their poor work performances. At this time, Gill and Dedrick also placed Plaintiff on a 90-day improvement plan designed to let her correct the deficiencies in her job performance. During this 90-day period, however, Ms. Hudson's performance did not improve.
 
 
 12
 In May 1991, Dedrick, with Gill's approval, gave Plaintiff a negative performance evaluation, rating her "minimally satisfactory" for the period April 1990 to April 1991.
 
 
 13
 On May 31, 1991, Hudson initiated an equal opportunity ("EEO") administrative complaint within the Department of Justice, charging that Dedrick and Gill had engaged in sex discrimination in violation of Title VII, and later, when she learned of Gill's refusal to raise her salary, she added an Equal Pay charge.
 
 
 14
 Unaware of Hudson's EEO complaint, on June 4, 1991, Gill and Dedrick demoted her to a line AUSA criminal position. However, this demotion did not affect Hudson's salary or regular interval pay increases. After Hudson's demotion, her former position as Civil Chief was abolished. A Criminal Chief position was subsequently created, and this position was given to Steve Clark, a male.
 
 
 15
 In the ensuing months, Hudson lied to Steve Clark about her leave status, and she was openly critical of Gill and Dedrick within the office and to outside attorneys, including advising one attorney that his client should try to resolve a case that the DOJ was prosecuting after Gill left his post, stating that the new U.S. Attorney would likely resolve it on terms more favorable to the defendant. She repeatedly referred to Gill and Dedrick in derogatory and obscene terms and implied that she was going to retaliate against them.
 
 
 16
 Gill ultimately requested that EOUSA investigate Hudson's misconduct and the general situation in the U.S. Attorney's office in Knoxville. The Executive Director of the EOUSA, Laurence McWhorter, sent EOUSA's Special Counsel, former U.S. Attorney John Volz, to investigate. Volz interviewed approximately 30 people about Hudson's alleged misconduct, and after finishing those interviews, Volz interviewed Hudson.
 
 
 17
 Eventually, Gill requested that the EOUSA terminate Hudson. On November 20, 1991, after receiving Gill's request, McWhorter wrote Hudson informing her that he intended to seek her termination based on the charges of misconduct made by Gill and Dedrick which Volz had investigated. McWhorter also informed Hudson that, prior to making a recommendation to the Deputy Attorney General, she would be given an opportunity to respond to the charges against her and her reply would be taken into consideration before further action was taken. Pending review of her conduct, Plaintiff was placed on non-duty status at full pay.
 
 
 18
 Shortly thereafter, Jerry Cunningham replaced John Gill as the U.S. Attorney for the Eastern District of Tennessee.
 
 
 19
 On December 11, 1991, Hudson filed an action in the district court alleging sex discrimination, retaliation and violations of the Privacy Act. In this action, Plaintiff sought, and was granted, a temporary restraining order ("TRO") enjoining DOJ from terminating her employment pending a preliminary injunction hearing. The District Court indefinitely continued the TRO. The Department of Justice successfully appealed the TRO decision to this Court, but 12 days before the District Court dissolved the TRO and ordered a preliminary injunction hearing without delay, Hudson resigned.
 
 
 20
 Although the EOUSA had referred the misconduct charges to the DOJ's Office of Professional Responsibility, the DOJ abandoned its efforts to terminate Hudson at the request of the new U.S. Attorney, Jerry Cunningham. Thus, in February 1992, Plaintiff returned to work.
 
 
 21
 Upon assuming office, Cunningham replaced Dedrick with Guy Blackwell as First Assistant. Prior to leaving, Dedrick showed Blackwell and Cunningham a file he had been keeping which contained his personal notes regarding Hudson's misconduct. This file, which was kept in a locked drawer, was separately categorized as the "First Assistant's" file and it was not retrievable under Hudson's name.
 
 
 22
 Although Cunningham initially supported Hudson, on June 25, 1992, he sent Hudson a memorandum detailing numerous instances of what he considered to be misconduct on her part during his tenure, including unauthorized removal of, and access to documents; lack of truthfulness to her superiors; failure to perform work and abuse of sick leave; and unprofessional and disruptive conduct. On October 27, 1992, Hudson filed another Complaint, again alleging additional Title VII sex discrimination and retaliation and Privacy Act claims, as well as an Equal Pay Act violation.[2]
 
 
 23
 In April 1993, allegations of misconduct before the grand jury resulted in Plaintiff's being suspended from appearing before the grand jury. Although an investigation by the Office of Professional Responsibility ("OPR") soon cleared her of any wrongdoing, she was not allowed to resume her grand jury work.
 
 
 24
 Cunningham eventually left office in May 1993, and was replaced on an interim basis by David Dake. In August 1993, Hudson learned that when Carl Kirkpatrick became the new permanent U.S. Attorney, James Dedrick would be transferring back as First Assistant.
 
 
 25
 Effective September 4, 1993, Hudson resigned, and in October 1993, she amended her Complaint to include a sex discrimination and retaliatory constructive discharge claim. Immediately thereafter, she went into private practice with Ailor, Andrews & Hudson, a small firm that she founded with two other lawyers.
 
 III. ISSUES ON APPEAL
 
 26
 As indicated above, Hudson appeals the District Court's rulings concerning compensatory damages, front pay, her Privacy Act claim, and the award of attorneys' fees. Specifically, Hudson appeals:
 
 
 27
 (1) the District Court's ruling that the damages that the jury awarded to her should be capped at $300,000 under 42 U.S.C. § 1981a(b)(3);
 
 
 28
 (2) the decision not to award her reinstatement or front pay as a remedy for the post-November 21, 1991 Title VII violations found by the jury;
 
 
 29
 (3) the determination that Plaintiff failed to prove any violation of the Privacy Act, 5 U.S.C. § 552a; and
 
 
 30
 (4) the District Court's award of attorneys' fees based on a rate of $150.00 per hour and refusal to award fees for work that it deemed duplicative or time spent on issues on which Plaintiff did not prevail.
 
 IV. ANALYSIS
 A. STANDARD OF REVIEW
 
 31
 The District Court's construction of the damage caps in § 1981a is a question of statutory construction and, accordingly is subject to de novo review. United States v. Spinelle, 41 F.3d 1056, 1057 (6th Cir.1994); United States v. Brown, 915 F.2d 219, 223 (6th Cir.1990). The District Court's decision not to award reinstatement or front pay, however, is reviewable only for an abuse of discretion. Roush v. KFC National Management Co., 10 F.3d 392, 399 (6th Cir.1993), cert. denied, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).
 
 
 32
 With respect to the Privacy Act, the District Court's legal construction is subject to de novo review, while its factual findings concerning the acts and motivations of Appellees are reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52. Cf. Johnston v. Horne, 875 F.2d 1415, 1423 (9th Cir.1989), and Chapman v. NASA, 736 F.2d 238, 242 (5th Cir.), cert. denied, 469 U.S. 1038, 105 S.Ct. 517, 83 L.Ed.2d 406 (1984), with Performance Unlimited v. Questar Publishers, Inc., 52 F.3d 1373, 1381 (6th Cir.1995). Finally, the District Court's determination of a fee award is reviewed for an abuse of discretion. Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Wayne v. Village of Sebring, 36 F.3d 517, 531-32 (6th Cir.1994), cert. denied, 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995).
 
 B. THE DAMAGES CAPS UNDER § 1981a
 
 33
 As indicated, above, the jury awarded Plaintiff a total of $1.5 million: (1) $250,000 in compensatory damages for sex discrimination; (2) $500,000 in compensatory damages for retaliation; and (3) $750,000 in compensatory damages for constructive discharge. The District Court, however, capped these compensatory damages at $300,000 pursuant to 42 U.S.C. § 1981a. On appeal, Hudson contends that the $300,000 cap in § 1981a does not apply to her entire lawsuit, but rather, separately to each claim raised. Thus, she urges this Court to award her $850,000: the total $250,000 amount awarded by the jury for the sex discrimination, the maximum capped $300,000 for the retaliation, and the maximum capped $300,000 for the constructive discharge.
 
 
 34
 The genesis of this dispute is the language of Section 1981a itself, which provides, in pertinent part:
 
 
 35
 (a)(1) In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. § 2000e-5 or 2000e-16] against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section....
 
 
 36
 * * * * * *
 
 
 37
 (b)(3) The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party--
 
 
 38
 (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.
 
 
 39
 42 U.S.C. § 1981a (emphasis added).
 
 
 40
 The parties do not dispute the applicability of this provision, but rather, the scope of the limitations[3]. Specifically, the question presented here is whether the § 1981a caps apply on a "per claim" or "per lawsuit" basis. Although this is a question of first impression, it is purely a matter of statutory construction.
 
 
 41
 A "familiar canon of statutory construction is that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (emphasis added). Moreover, "words will be interpreted as taking their ordinary, contemporary, common meaning," Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), so that "[i]n construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose." Mills Music, Inc. v. Snyder, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985). Therefore, if the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced, United States v. Ron Pair Entrs., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), because " 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there'." Department of Defense v. FLRA, 510 U.S. 487, 503, 114 S.Ct. 1006, 1016, 127 L.Ed.2d 325 (1994) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)).
 
 
 42
 In relevant part, Section 1981a plainly States that "[i]n an action brought by a complaining party ... the complaining party may recover compensatory and punitive damages," although "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party ... $300,000." (Emphasis added).
 
 
 43
 Under the plain language of the statute, the cap on compensatory damages applies to each complaining party in an "action". An "action" is simply a "lawsuit brought in court." Black's Law Dictionary at 18 (6th ed.1991). Similarly, the Federal Rules of Civil Procedure use the term "action" or "civil action" to describe all claims for relief alleged in a single lawsuit. See Fed.R.Civ.P. 2 and 3. Put simply, the § 1981a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise. The face of the statute is conclusive and this is the reading of it that the Court must apply. Indeed, district courts have uniformly reached this same conclusion. Krahel v. Owens-Brockway Glass Container, Inc., 971 F.Supp. 440, 455 (D.Or.1997); Flor v. O'Leary, Civ. 93-1343 (D.N.Mex.1995) (unpublished); Rogerson v. Widnall, Civ. 92-5038 (D.S.D.1995) (unpublished); Baker v. Dalton, Civ. 92-1082 (S.D.Cal.1994) (unpublished); Reynolds v. CSX Transp., 1995 U.S. Dist. LEXIS 9853 at 3 (M.D.Fla.1995) (unpublished), affirmed in part on other grounds and reversed in part on other grounds, 115 F.3d 860 (11th Cir.1997).[4]
 
 
 44
 Apparently realizing that the plain language of the statute weighs heavily against her argument, Plaintiff turns to the legislative history. First, she contends that the phrase "for each complaining party" was added as a last minute amendment in order to make it clear that the damage caps did not limit the damages available to individual plaintiffs when several of them joined in one civil action, relying on the following joint statement of the amendment's co-sponsors, Senators Hatch and Kennedy:
 
 
 45
 The amount of damages that a victim can recover should not depend on whether that victim files her own lawsuit or joins with other similarly situated victims in a single case. Rather, the amount of damages should depend on the injury the victim has suffered, subject to the caps. This amendment ensures that the remedy provided in the [bill] is available to each individual who has been subjected to abuse.
 
 
 46
 137 Cong.Rec. S 15471 (daily ed. Oct, 30, 1991). Thus, Hudson argues that the phrase "for each complaining party" should be read as insuring that the caps are applied on a per plaintiff basis, not on a per lawsuit basis when there may be several plaintiffs.
 
 
 47
 However, as Defendants point out, the section-by-section analysis of the bill that the Administration submitted after the President initially vetoed it plainly states that the caps should apply on a per lawsuit basis, regardless of how many discriminatory practices that a plaintiff alleges under § 1981a. 137 Cong.Rec. S 3025 (daily ed. March 12, 1991). Defendants also point out a statement from Senator Kennedy that suggests per lawsuit caps instead of per claim caps:
 
 
 48
 The bill does not give victims an unlimited entitlement to damages ... The amount of most compensatory and all punitive damages that each individual complaining party can obtain is limited to ... $300,000....
 
 
 49
 137 Cong.Rec. S15234 (daily ed. Oct. 25, 1991). Thus, the legislative history does not in fact support Hudson's "per claim" argument.
 
 
 50
 Hudson also relies upon the following passage of an interpretive memorandum submitted by seven Republican sponsors of the bill:[T]he following limitations also are placed on the damages available to each individual complaining party for each cause of action brought under section 1981[a]....
 
 
 51
 137 Cong.Rec. H 9527 (daily ed. Nov. 11, 1991).
 
 
 52
 Defendants, however, point out that the excerpted statement from the Republican sponsors is taken out of context and that in this statement the Senators were simply making it clear that the § 1981a caps did not apply to § 1981 claims so that an award for sex discrimination under § 1981a would not cap an award for race discrimination under § 1981. See 137 Cong.Rec. S 15484 (daily ed. Oct. 30, 1991).
 
 
 53
 Plaintiff further argues that a section-by-section analysis that Congressman Edwards, a sponsor of the House version, placed in the Congressional Record after passage, but before the President signed the bill into law supports her interpretation:
 
 
 54
 [T]he limitations on damages awards in the legislation ... apply to damages available to each individual complaining party for each cause of action brought under Section 1981a.
 
 
 55
 137 Cong.Rec. H 9527 (daily ed. Nov. 11, 1991).
 
 
 56
 However, with respect to Congressman Edwards' analysis, remarks made after the passage of a bill are not legislative history, and isolated remarks of a single member of Congress should be given little weight. See, Landgraf v. USI Film Products, 511 U.S. 244, 263 n.15, 114 S.Ct. 1483, 1495 n.15, 128 L.Ed.2d 229 (1994) ("[A] court would be well advised to take with a large grain of salt floor debate and statements placed in the Congressional Record which purport to create an interpretation for the legislation that is before us"). Obviously, this is even more true when the statements are placed in the record after the bill had been passed and sent to the President.
 
 
 57
 Hudson also notes that the EEOC adopted a "per claim" cap position in an amicus brief that it filed in a case on appeal to the Eleventh Circuit--Reynolds v. CSX Transportation, No. 95-3364 (11th Cir.).[5] Thus, Plaintiff argues that the Court should defer to the EEOC's view. E.E.O.C. v. Commercial Office Products Co., 486 U.S. 107, 115-16, 108 S.Ct. 1666, 1671-72, 100 L.Ed.2d 96 (1988). However, as Defendants note, such deference is only appropriate with respect to ambiguous language, see id.; the EEOC's interpretation is entitled to no deference when its position is at odds with the plain language of the statute.
 
 
 58
 Plaintiff's final argument is that if the Court adopts a per lawsuit cap, it will simply encourage plaintiffs to file multiple lawsuits in order to circumvent the caps. But, as Defendants observe, the consolidation of actions under the Federal Rules of Civil Procedure and doctrines such as res judicata prevent such multiplicity. Moreover, Defendants argue that Hudson really only has one Title VII claim here based on the same core facts, and that to split her case into three different claims for the purposes of applying the damage caps ignores this reality.
 
 
 59
 The foregoing demonstrates the lack of merit in Plaintiff's "per claim" arguments. Simply stated, when a statute is plain on its face, courts should look no further than the statute itself. Therefore, the Court finds that the District Court correctly interpreted § 1981a when it capped Plaintiff's compensatory damages at $300,000.
 
 C. REINSTATEMENT AND FRONT PAY
 
 60
 At trial, the District Court found no sex discrimination or retaliation through November 20, 1991, while for the time period thereafter, the jury awarded Plaintiff $1.5 million for sex discrimination, retaliation, and constructive discharge. Based on the jury's findings, Plaintiff requested five years of front pay, the time she expected it would take to build up her private practice. She did not request reinstatement.
 
 
 61
 The District Court declined to award Hudson either reinstatement or front pay. With respect to reinstatement, the court found that: (1) hostility existed between the parties; (2) Hudson immediately found other work; and (3) the DOJ was genuinely dissatisfied with Hudson's job performance. Accordingly, the District Court held that reinstatement was not appropriate.
 
 
 62
 With respect to front pay, the District Court found that: (1) Hudson had other job opportunities, namely the legal partnership that she joined immediately after leaving the DOJ; (2) Hudson is relatively young and has approximately 20 years, or more, of earning power left; and (3) there is no evidence in the record to suggest that she suffered any loss of income. Therefore, the District Court concluded that neither reinstatement nor an award of front pay was necessary to make Plaintiff whole as a consequence of her constructive discharge.
 
 
 63
 As indicated above, this Court reviews these conclusions for abuse of discretion.
 
 
 64
 On appeal, Hudson argues that: (1) the evidence adduced at trial does not support the District Court's conclusions regarding reinstatement and the District Court's conclusions are at odds with the jury's findings; and (2) with respect to front pay, the District Court's finding that other job opportunities were available to her is unsupported in the record; and (3) the District Court impermissibly put the burden on Plaintiff to demonstrate that she had suffered no financial loss as a result of her constructive discharge.
 
 
 65
 It is well-established that under Title VII a court may, as an equitable make-whole remedy, order that the plaintiff be reinstated to his or her previous position. Cf. Henry v. Lennox Industries, 768 F.2d 746, 752 (6th Cir.1985) and Farber v. Massillon Board of Education, 917 F.2d 1391, 1396 (6th Cir.1990) with Roush v. KFC National Management Co., 10 F.3d 392, 398 (6th Cir.1993), cert. denied, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).
 
 
 66
 Although reinstatement is "the presumptively favored equitable remedy ... [it] is not appropriate in every case, such as where the plaintiff has found other work, where reinstatement would require displacement of a non-culpable employee or where hostility would result." Roush, supra, 10 F.3d at 398 (citations omitted); See also Shore v. Federal Express Corp., 777 F.2d 1155, 1159 (6th Cir.1985) (reinstatement inappropriate where it results in displacement or where the hostility between the parties "precludes the possibility of a satisfactory employment relationship"). Moreover, an employer's genuine dissatisfaction with an employee's job performance is another factor which weighs against reinstatement. McKnight v. General Motors Corp., 973 F.2d 1366, 1370 (7th Cir.1992), cert. denied, 507 U.S. 915, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993). Nevertheless,
 
 
 67
 [t]he basis upon which reinstatements ... may be denied must be more compelling than the personal preferences and distrusts which accompanied the initial discriminatory activity. "It is not enough that reinstatement might have 'disturbing consequences,' that it might revive old antagonisms, or that it could 'breed difficult working conditions' because relief is not restricted to that which will be pleasing and free of irritation." The district court, on such petition, is of course bound by the jury's decision of the issue of prior discrimination.
 
 
 68
 Farber, supra, 917 F.2d at 1396.
 
 
 69
 Here, the District Court concluded that: (1) Hudson had found other work; (2) a non-culpable third party would be displaced; (3) hostility precluded a satisfactory employment relationship; and (4) the employer was genuinely dissatisfied with Hudson's job performance. The record indicates that Plaintiff found other work by starting her own legal practice. Moreover, the record clearly demonstrates that the working relationship between Hudson and her former DOJ colleagues had been destroyed by strong animosities and distrust on both sides. Finally, the record also indicates that the DOJ was legitimately dissatisfied with Hudson, based on numerous instances of misconduct. Thus, although Plaintiff correctly points out that there is no specific factual finding which suggests that a third-party would be displaced, we find that the District Court's decision not to award reinstatement is amply supported by the record and the relevant case law and is, therefore, not an abuse of discretion.
 
 
 70
 With respect to Plaintiff's appeal of the refusal of the District Court to award front pay, we find that this issue is moot in light of our holding that the cap on compensatory damages set forth in Section 1981a of the 1991 Civil Rights Act applies to lawsuits as a whole and not merely to claims. We reach this decision because we find that front pay is an award of damages to compensate for "future pecuniary losses", and as such, falls within the statutory language of compensatory damages which is, in turn, subject to the statutory caps on damages set forth in 42 U.S.C. § 1981a(b)(3).
 
 
 71
 We begin by observing that prior to the enactment of the 1991 Civil Rights Act, many courts, including the Sixth Circuit,[6] routinely awarded "front pay" as an alternative to reinstatement in Title VII actions, under the powers and remedies provision of Section 706(g) of the Civil Rights Act of 1964 which provides, in relevant part:
 
 
 72
 If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.
 
 
 73
 42 U.S.C. § 2000e-5(g). This is the authority cited by the District Court in deciding whether to award front pay in this case "to remedy the post-1991 Act violations of Title VII". [8/10/95 Findings of Fact and Conclusions of Law, pp. 3, 37-43 (emphasis added).]
 
 
 74
 However, as indicated above, the 1991 Civil Rights Act provides that "compensatory damages ... for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" are subject to the statute's damages limitations. 42 U.S.C. § 1981a(b)(3). The 1991 Act only excludes from the Act's damages caps "back pay, interest on back pay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964."
 
 
 75
 The question then is whether "front pay" is "compensatory damages for future pecuniary losses " or whether it is "any other type of relief authorized under section 706(g) " i.e., "any other equitable relief that the court deems appropriate."
 
 
 76
 Congress did not define the phrase "future pecuniary losses" in § 1981a or in any other statute. Therefore, as we noted in construing the statute earlier, our responsibility is to give the phrase its "ordinary, contemporary, common meaning." Perrin v. United States, supra, 444 U.S. at 42, 100 S.Ct. at 314. According to Webster's Dictionary, these three words ["future pecuniary losses"] are defined as follows:
 
 
 77
 1. Future: existing or occurring at a later time;
 
 
 78
 2. Pecuniary: consisting of or measured in money;
 
 
 79
 3. Losses: an amount that is lost.
 
 
 80
 Webster's Ninth New Collegiate Dictionary, pp. 500, 806, 700 (1988).
 
 
 81
 Given the plain meaning of these three words, we must conclude that the term "future pecuniary losses" must be given its common, ordinary, meaning, i.e., an amount of money which will be lost at a later time. We then turn to the legal definition and purpose of "front pay" to determine if it fits within the meaning of "future pecuniary losses."
 
 
 82
 "Front pay" is widely defined as the salary that an employee would have received had he or she not been subjected to unlawful discrimination of his employer, subject to the employee's mitigating his or her damages. See, e.g., Shore v. Federal Express Corp., 42 F.3d 373, 377-78 (6th Cir.1994). Thus, "front pay", by both its definition and purpose in the law, is a "future pecuniary loss" because it is a monetary award for the salary that the employee would have received but for the discrimination. The problem arises, however, because, as noted above, courts have awarded front pay as an alternative to reinstatement under § 706(g) of Title VII. But, "front pay" is not specifically "authorized" by § 706(g) and in the Sixth Circuit, we have treated front pay, in most contexts, as a legal, rather than an equitable, remedy by ruling that, although it is for the court to determine whether front pay is appropriate in lieu of reinstatement, the determination of the amount of any such award is a matter for the jury to decide. See, e.g., Roush v. KFC Nat. Mgmt. Co., supra 10 F.3d at 398-400; Suggs v. ServiceMaster Educ. Food Management, supra. See also, Fite v. First Tennessee Production Credit Ass'n, 861 F.2d 884, 893 (6th Cir.1988).
 
 
 83
 Furthermore, we believe that not only must we give the phrase "future pecuniary losses" its ordinary meaning, but we must also give it substance and not render it meaningless. If the phrase "future pecuniary losses" were not construed to include front pay, the phrase would be rendered meaningless because the statute separately "defines" compensatory damages subject to the Act's damages caps as compensatory damages for "future pecuniary losses" and "nonpecuniary losses". See 42 U.S.C. § 1981a(b)(3). Further, if the term does not refer to front pay, it is hard to see what it would refer to, as front pay has always been the heart of "future pecuniary losses" in discrimination suits.
 
 
 84
 Based upon the foregoing analysis, we conclude that front pay is subject to the caps on future pecuniary losses as provided in § 1981a(b)(3) because front pay is a "future pecuniary loss" and is not authorized by the plain language of § 706(g) itself. And, because the jury verdict here exceeded $300,000--the applicable compensatory damages limitation under the 1991 Act--the cap has been exhausted, leaving no room under the cap for any further award of front pay. Therefore, Hudson's argument that the District Court erred in refusing to award her any front pay is rendered moot.
 
 D. THE PRIVACY ACT
 
 85
 1. Plaintiff's Claims at Trial and the District Court's Resolution of Them
 
 
 86
 At trial, Hudson alleged the following claims under the Privacy Act:
 
 
 87
 1. Defendants violated § 552a(e)(2) of the Privacy Act during the investigation into her conduct by Volz when he collected information about her by questioning others when such information could have allegedly been collected from Hudson herself.
 
 
 88
 2. Through his questioning, Volz spread false allegations of misconduct on Hudson's part to each of those people interviewed, thus violating the Privacy Act by releasing information about her to those who are not authorized to receive such information. Similarly, she also alleges that in speaking to Cunningham and others outside government about her, Dedrick released information about her to those who were not authorized to receive such information, in violation of 5 U.S.C. § 552a(b).
 
 
 89
 3. Dedrick, Gill, Cunningham, and other employees of the U.S. Attorney's Office and the EOUSA violated the Privacy Act by establishing and maintaining a "secret," name-retrievable file about her and in using information in that file as a basis for personnel decisions concerning her.
 
 
 90
 4. The U.S. Attorney's Office violated § 552a(d) of the Privacy Act when it did not correct her 1990-91 performance rating until June 1992, although it was ordered changed in December 1991 as a result of the grievance decision. Hudson also alleged that Defendants refused to correct other information about her contained in her personnel file.
 
 
 91
 The District Court denied Hudson relief on each of these claims, and we find no error in the District Court's decision.
 
 
 92
 The Privacy Act of 1974 regulates the collection, maintenance, use, and dissemination of information concerning individuals. The Act attempts to strike a balance between the government's need to collect and maintain information and the privacy interests of the persons to whom such information pertains. See, e.g., DePlanche v. Califano, 549 F.Supp. 685, 695 (W.D.Mich.1982).
 
 
 93
 Turning to Hudson's first Privacy Act claim in this action, that Defendants violated § 552a(e)(2) of the Privacy Act when Volz went to others to collect information about her before meeting with her personally, to maintain a claim under § 553a(e)(2), a plaintiff must establish the following elements:
 
 
 94
 (1) that defendant failed to elicit information about plaintiff "to the greatest extent practicable " from plaintiff;
 
 
 95
 (2) that the violation of the Act was intentional or willful; and
 
 
 96
 (3) that defendant's actions had an adverse impact on plaintiff.
 
 
 97
 See 5 U.S.C. §§ 552a(e)(2); 552a(g)(4); 552a(g)(1)(D) (emphasis added).
 
 
 98
 The OMB guidelines, which the statute authorizes and which were promulgated simultaneously with the Act, provide that when conducting an investigation into a particular person, third party sources may be contacted first when practical considerations, such as confirming or denying false statements, require this or when the information can only be obtained from third parties. See, e.g., 40 Fed.Reg. 28,948, 28,961 ("Practical considerations ... may dictate that a third party source ... be used as a source of information in some cases ... [I]t may well be that the kind of information needed can only be obtained from a third party"). The case law also recognizes the realities of conducting an investigation and identifies other "practical considerations." See, Brune v. I.R.S., 861 F.2d 1284, 1287 (D.C.Cir.1988) (where possibility exists that a federal employee who is the subject of an internal agency investigation will intimidate third-party witnesses, an agency investigator need not contact the subject employee before contacting others).
 
 
 99
 Here, the District Court found, based on evidence clearly established in the record, that Hudson was suspected of making false statements and she was allegedly intimidating and threatening people and otherwise dividing the U.S. Attorney's office. (Joint Appendix, Letter from Gill to EOUSA, p. 255; Joint Appendix, District Court Opinion, fn. 28 and 29, p. 139). All of these practical considerations demonstrate that Volz did not violate the Privacy Act when he interviewed others before interviewing Hudson.
 
 
 100
 Plaintiff also claims that in interviewing witnesses, Volz spread rumors about her. The District Court found, however, that Volz only received information and conveyed only the facts and circumstances that were necessary for him to frame his questions. More importantly, the Privacy Act only prohibits the disclosure of information that has been retrieved from a system of records. Wilborn v. Dept. of HHS, 49 F.3d 597, 600 (9th Cir.1995). The "spreading of rumors" is more closely akin to office gossip than to the disclosure of records protected by the Privacy Act.[7] See Beaulieu v. U.S., 865 F.2d 1351, 1352 (1st Cir.1989). Moreover, the District Court found that neither Volz nor the EOUSA intentionally or willfully violated Hudson's rights under the Privacy Act.[8] Henson v. NASA, 14 F.3d 1143, 1149 (6th Cir.1994) (plaintiff must prove that the government's actions were intentional or willful); Kostyu v. U.S., 742 F.Supp. 413, 416 (E.D.Mich.1990) (culpability under the Privacy Act requires a showing of fault greater than gross negligence); Moskiewicz v. Dept. of Agriculture, 791 F.2d 561, 563 (7th Cir.1986); Andrews v. Veterans Admin. of United States, 838 F.2d 418, 425 (10th Cir.), cert. denied, 488 U.S. 817, 109 S.Ct. 56, 102 L.Ed.2d 35 (1988) (conduct must be patently egregious and unlawful); Albright v. United States, 732 F.2d 181, 189 (D.C.Cir.1984) (intentional or willful standard under the Privacy Act does not encompass all voluntary actions with might otherwise inadvertently contravene one of the Act's strictures). The District Court's finding on this issue, which is subject to a clearly erroneous standard of review, is fully supported by the record. (Joint Appendix, Volz Testimony, pp. 547-55). Therefore, it must stand.
 
 
 101
 Plaintiff next complains that Dedrick kept a "secret" file on her which contained false information in violation of the section of the Privacy Act governing the maintenance of, and access to, employee files. Specifically, she cites 5 U.S.C. § 552a(d)(1) which provides:
 
 
 102
 (d) Access to records.--Each agency that maintains a system of records shall--
 
 
 103
 (1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence....
 
 
 104
 (Emphasis added). Critical to Hudson's argument, therefore, is the proposition that Dedrick's personal notes were "a system of records" within the meaning of the statute.
 
 
 105
 Under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Plainly, Dedrick's notes about Plaintiff's misconduct which were kept in a locked drawer and labeled the "First Assistant's" files do not fall within this definition. See Smiertka v. United States Dep't of Treasury, 447 F.Supp. 221, 228-29 (D.D.C.1978), vacated and remanded on other grounds, 604 F.2d 698 (D.C.Cir.1979) (plaintiff not entitled to daily reports prepared by an agency investigation because they were not accessible by the plaintiff's name or other personal identifier, but by the name of the agency investigator who prepared them); Manuel v. Veterans Administration Hospital, 857 F.2d 1112, 1119 (6th Cir.1988), cert. denied, 489 U.S. 1055, 109 S.Ct. 1317, 103 L.Ed.2d 586 (1989) (same). Accordingly, the Court will not disturb the District Court's conclusion.
 
 
 106
 Alternatively, Plaintiff argues that these notes should have been made part of a system of records because 5 U.S.C. § 552a(e)(5) states:
 
 
 107
 (e) Agency requirements.--Each agency that maintains a system of records shall--
 
 
 108
 (5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.
 
 
 109
 The District Court, however, found that Dedrick's personal notes were not used to make any determination with respect to Plaintiff,[9] noting that Cunningham did not return Plaintiff to the position of Civil Chief because: (1) he only had one supervisory slot available; (2) he needed a Criminal Chief; and (3) the other staff did not respect Plaintiff. See Johnston v. Horne, 875 F.2d 1415, 1423 (9th Cir.1989) (supervisor's notes about an employee not covered under Privacy Act unless plaintiff establishes causal link between the notes and adverse employment decisions); Bowyer v. United States Dept. of Air Force, 804 F.2d 428, 431-32 (7th Cir.1986) (same); Boyd v. Secretary of the Navy, 709 F.2d 684, 686-87 (11th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Hudson has not cited us to anything in the record to demonstrate that the District Court's finding here is clearly erroneous. Therefore, this Court must affirm.[10]
 
 
 110
 Finally, Hudson contends that DOJ did not properly correct her 1990-91 performance evaluation and improperly disclosed it within the office. On the first point, the Privacy Act provides that an agency shall "maintain all records which are used ... in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). Here, the District Court found that DOJ made reasonable efforts to timely correct the evaluation and there is nothing in the record to suggest otherwise. On the second point, the District Court found that the evaluation was only disclosed to Sandy Dennis, who had typed it originally, for re-typing. Clearly, as the District Court found, this is within the necessary (need to know) disclosures that the Privacy Act exempts from liability. 5 U.S.C. § 552a(b)(1).
 
 
 111
 A final basis for affirming the District Court's decision with respect to Hudson's claims under the Privacy Act is her failure to show "actual damages," as required by the Act. 5 U.S.C. § 552a(g)(4). Hudson attempts to bootstrap her Title VII claims by arguing that the compensatory damages that the jury found on these issues evidence her damages under the Privacy Act. This argument is problematic for several reasons. First, the weight of authority suggests that actual damages under the Privacy Act do not include recovery for "mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries." Fitzpatrick v. Internal Revenue Serv., 665 F.2d 327, 331 (11th Cir.1982); Pope v. Bond, 641 F.Supp. 489, 501 (D.D.C.1986); DiMura v. FBI, 823 F.Supp. 45, 48 (D.Mass.1993).[11] Further, Hudson did not carry her burden of showing that the alleged violations of the Privacy Act caused her any damages. See Molerio v. F.B.I., 749 F.2d 815, 826 (D.C.Cir.1984).
 
 
 112
 Based upon the foregoing discussion, we find no error in the District Court's decision regarding Hudson's Privacy Act claims.
 
 E. ATTORNEYS' FEES
 
 113
 1. Fees of Wanda Sobieski and Herbert Moncier
 
 
 114
 Hudson initiated this action by filing a petition for a TRO and preliminary injunction to prevent the DOJ from taking adverse employment action against her. At that time, Wanda Sobieski represented Plaintiff, until she withdrew and was replaced by Herbert Moncier because Sobieski witnessed a material event in the case.[12] The District Court granted the TRO and extended it indefinitely. On appeal, this Court dissolved the TRO and ordered the preliminary injunction hearing without delay. Hudson, supra, 3 F.3d at 975. However, 12 days before the scheduled hearing, Hudson resigned, claiming constructive discharge, and thus, the preliminary injunction issue became moot.
 
 
 115
 Post-trial, the District Court refused to award any fees to Sobieski and Moncier reasoning that: (1) for the purposes of their representation, Hudson was not a prevailing party because the preliminary relief, the TRO, that they obtained fell short of an unambiguous indication of probable success on the merits, especially in light of this Court's reversal, Webster v. Sowders, 846 F.2d 1032, 1036 (6th Cir.1988); (2) ultimately, the claims that Sobieski and Moncier worked on--the pre-November 20, 1991 claims--proved unsuccessful, and it is well-established that a plaintiff is not entitled to attorneys' fees based on interim orders (TROs) that may have in fact benefitted the plaintiff when he or she loses the case on the underlying merits of the claim, NAACP, Detroit Branch v. D.P.O.A., 46 F.3d 528, 530 (6th Cir.1995); and (3) Sobieski requested fees that arose after her representation ceased and for matters that appeared to be related to her testimony at trial--neither of which are compensable. The District Court's reasoning here is consistent with the case law and the facts of this case and is, therefore, not an abuse of discretion.
 
 
 116
 2. Hourly Rates for Kator, Scott & Heller and Swick & Shapiro
 
 
 117
 In her Petition for attorneys' fees, Hudson also sought compensation for the work of her lead counsel in this matter, Kator, Scott & Heller and Swick & Shapiro, with David Shapiro being her primary attorney.[13] During this case, Shapiro's and his partners' usual and customary billing rates were between $225 and $300 per hour, consistent with other lawyers of similar backgrounds in Washington, D.C.
 
 
 118
 The District Court, however, found that $150 per hour was a reasonable rate for these lawyers. In reaching that conclusion, the court canvassed the record as to the billing rate for attorneys in Knoxville, Tennessee, noting that during the relevant time period the time the billing rate for other lawyers on this case, specifically Hudson's law partner, James Andrews, and Attorneys Sobieski and Moncier, ranged from $125-$135, $150-$250, and $125-$135 per hour, respectively. Referring to Sobieski's rates, because of her extensive Title VII background, the District Court concluded that a reasonable fee for the Washington, D.C. lawyers was $150 per hour, which is slightly higher than Sobieski's $135 per hour rate.
 
 
 119
 On appeal, Hudson challenges the $150 per hour rate, contending that the Court should award her the rates normally charged by her Washington, D.C. lawyers because of their special expertise which was called upon in this matter.
 
 
 120
 It is well-established that "[a] district court has broad discretion to determine what constitutes a reasonable hourly rate for an attorney." Wayne v. Village of Sebring, 36 F.3d 517, 531-32 (6th Cir.1994), cert. denied, 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995). In particular, this Court has made clear that "it is not an abuse of discretion for a court to apply local market rates." Id. Thus, "a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate." Coulter v. Tennessee, 805 F.2d 146, 149 (6th Cir.1986), cert. denied, 482 U.S. 914, 107 S.Ct. 3186, 96 L.Ed.2d 674 (1987). The District Court's reasoning here is well-supported by the relevant case law and the facts of this case, therefore, this Court finds no abuse of discretion.[14]
 
 3. Reduction of Hours
 
 121
 In making the fee award, the District Court also reduced the number of hours that Plaintiff petitioned for in two instances. Hudson challenges each of these reductions.
 
 
 122
 First, the District Court refused to award fees for post-trial work that related to the preparation of Hudson's proposed findings of fact and conclusions of law in the non-jury portion of the trial in which she did not prevail. It is beyond peradventure that a District Court may exclude time for work on a claim on which the plaintiff did not prevail.[15] See Hensley, supra, 461 U.S. at 436-37, 103 S.Ct. at 1941 ("[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success" ); Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("if 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount' "). Thus, the District Court must be affirmed here.
 
 
 123
 Second, the District Court reduced the fees of Andrews by 25% to account for duplication of effort in trial, trial preparation, and the pre-trial conference. Hudson argues that this reduction was improper because the DOJ was represented in the courtroom by four lawyers, while Andrews was Shapiro's only assistant at trial. Again, this argument is irrelevant to the District Court's determination that some of Andrews' time was duplicative. It is well-established that "[t]he lower court's determination that an indefinite number of hours claimed by Plaintiffs are excessive or duplicative is a finding of fact, which is to be affirmed unless clearly erroneous." Wayne, supra, 36 F.3d at 532. Therefore, the district court may take such duplication into account by making a simple across-the-board reduction by a certain percentage. See Coulter, supra, 805 F.2d at 152. Hudson has offered the Court no relevant reason why the District Court's findings and conclusions here should be disturbed, and therefore, the Court finds that the District Court must be affirmed.
 
 V. CONCLUSION
 
 124
 For all of the reasons stated above in this Opinion, the District Court's decisions on all of the issues are AFFIRMED.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 November 21, 1991 is the date on which the Civil Rights Act of 1991, 42 U.S.C. § 1981a, et seq., became effective. The 1991 Act amended Title VII to provide for jury trials on sex discrimination and retaliation claims
 
 
 [2]
 The December 11, 1991 and October 27, 1992 Complaints were consolidated
 
 
 [3]
 It is undisputed that DOJ employs more than 500 employees and that Hudson was awarded compensatory damages for intentional sex discrimination, retaliation, and constructive discharge under Title VII
 
 
 [4]
 As Defendants point out, this result is consistent with the uniform precedent that has construed § 1981a as establishing a single cap for all types of damages awarded, compensatory and punitive alike. E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1281 (7th Cir.1995); Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1355 (7th Cir.1995); Hogan v. Bangor and Aroostook R.R., 61 F.3d 1034, 1037 (1st Cir.1995); Selgas v. American Airlines, Inc., 858 F.Supp. 316, 326 (D.P.R.1994), affirmed in part, vacated in part, 69 F.3d 1205 (1st Cir.1995); Emmel v. Coca-Cola Bottling Co. of Chicago, Inc., 904 F.Supp. 723, 739-41 (N.D.Ill.1995), affirmed, 95 F.3d 627 (7th Cir.1996); Solomon v. Godwin and Carlton, P.C., 898 F.Supp. 415, 416 (N.D.Tex.1995)
 
 
 [5]
 The Eleventh Circuit has since decided this appeal, but the Court did not address the issue of damages caps under § 1981a. Reynolds v. CSX Transportation, Inc., 115 F.3d 860 (1997)
 
 
 [6]
 See, e.g., Shore v. Federal Express Corp., supra; Suggs v. ServiceMaster Educ. Food Management, 72 F.3d 1228 (6th Cir.1996)
 
 
 [7]
 To the extent that Volz was "spreading rumors" based on information in Dedrick's file, the Court concludes that this allegation still does not trigger the Privacy Act since Dedrick's file is not covered by the Act, as discussed, infra
 
 
 [8]
 Hudson argues that because the jury found discrimination and retaliation post-November 20, 1991, this somehow binds the District Court's fact-finding and legal conclusions regarding the Privacy Act. This argument has no legal significance because it was the District Court, not the jury, that was the fact-finder on the Privacy Act claims. Thus, the District Court is not bound by anything that the jury did on the post-November 20, 1991 Title VII claims
 
 
 [9]
 Therefore, Hudson's reliance on Chapman v. NASA, 682 F.2d 526, 528-30 (5th Cir.1982), is misplaced because in that case it was uncontroverted that the notes played a part in the plaintiff's discharge and that the notes were an ambush on the plaintiff who had been lulled by his positive performance reviews into thinking that his work was satisfactory
 
 
 [10]
 Moreover, even if the file were subject to the Privacy Act, it was only disclosed to others, namely Plaintiff's supervisors, on a "need to know" basis within DOJ. See 5 U.S.C. § 552a(b)(1) (bar on disclosure of records without written permission of individual does not apply where the officers and employees of the agency that maintains the record need the record to perform their duties)
 
 
 [11]
 There is one case to the contrary which holds that emotional damages are recoverable under the Privacy Act, Johnson v. Department of Treasury, 700 F.2d 971 (5th Cir.1983). However, as other courts have observed this case fails to recognize the bedrock principle that courts must strictly construe waivers of immunity in favor of the sovereign and not enlarge the waiver beyond what the language requires. DiMura, supra, 823 F.Supp. at 48. As even the Johnson Court noted the term "actual damages" has no plain meaning or consistent legal interpretation, thus when it is being applied against the government it must be narrowly interpreted--here that requires finding that actual damages only mean out-of-pocket losses, not emotional distress
 
 
 [12]
 Apparently, Cunningham told Sobieski in January 1992 that he could no longer support Hudson due to pressure from EOUSA to remove her
 
 
 [13]
 Shapiro tried the case for Plaintiff and has been her lead counsel in this matter since mid-1992. As of March 1, 1993, he has worked at the Washington, D.C. law firm of Swick & Shapiro, P.C., and has been assisted in representing Hudson there through his law partner Richard Swick and an associate. Prior to this time, he was a partner in the Washington, D.C. law firm of Kator, Scott & Heller, Chartered, and there he was assisted in representing Plaintiff by two partners, Joseph Scott and Douglas Huron and two associates
 
 
 [14]
 Plaintiff argues that only Washington, D.C. lawyers should have litigated this case because it involved the DOJ and because the DOJ was using lawyers out of its Washington, D.C. office. This argument misses the point. Title VII cases require no Department of Justice expertise, and the DOJ's choice of counsel is simply not relevant to any fee award for a plaintiff
 
 
 [15]
 We note that the District Court expressly awarded fees for all time spent at trial, regardless of whether Plaintiff prevailed on a particular claim, due to the interrelated nature of many of her claims and the necessity of fleshing out all of the relevant circumstances and events, regardless of the pre and post November 20, 1991 distinction