**Meriola Z. GOTTHARDT, Plaintiff–Appellee–Cross–Appellant,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, dba Amtrak, Defendant–Appellant–Cross–Appellee.**

**Nos. 98–15072, 98–15074 and 98–15274.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1999.

Decided Sept. 14, 1999.

Charlotte F. Adington, Kauff, McClain & McGuire, San Francisco, California, and Kathleen J. Raynsford, National Railroad Corporation, Washington, D.C., for the defendant-appellant-cross-appellee.

Howard Moore, Oakland, California and Felicia C. Curran, Sterns & Walker, San Francisco, California, for the plaintiff-appellee-cross-appellant.

Before: KRAVITCH,[1] REINHARDT, and T.G. NELSON, Circuit Judges.

1. The Honorable Phyllis A. Kravitch, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

KRAVITCH, Circuit Judge:

The National Railroad Passenger Corporation ("Amtrak") appeals the district court's award of $124,010.46 in back pay and $603,928.37 in front pay to Meriola Z. Gotthardt ("Gotthardt") in an employment discrimination action. Gotthardt cross-appeals, claiming that the district court also should have awarded her back pay in a related, consolidated action. In addition to a number of other issues, this appeal requires us to address an issue of first impression in this circuit, whether a court may award front pay in a Title VII action in excess of the $300,000 cap set out in 42 U.S.C. § 1981a(b)(3). Finding no error, we affirm.

## I. BACKGROUND AND PROCEEDINGS BELOW

Gotthardt began working as a fireman, or assistant engineer, on Amtrak's trains in 1988. Between early 1990 and late 1991, Gotthardt attempted to qualify to become an engineer on certain train routes. Amtrak engineers must qualify for each route they cover by passing an oral examination and operating a train on the route, accompanied by a supervisor, to demonstrate their ability to handle the train and their familiarity with the route. Gotthardt alleges that on a number of occasions she was subjected to conduct that constituted hostile work environment sexual harassment.

In early 1993, after a series of developments that rendered Gotthardt unable or unqualified to fill many of Amtrak's engineering positions, she took a position as an overnight shift yard engineer, or "midnight goat." According to Gotthardt, one of the yard supervisors regularly called her insulting, degrading names and subjected her to other harassing and discriminatory treatment. Amtrak eliminated

Gotthardt's "midnight goat" position in April 1995.

Gotthardt then attempted to become an engineer on' the Capitol Run (a route through Oakland, San Jose, and Sacramento). After training on this route, she scheduled a "checkride" to determine if she was qualified for the route. On May 5, 1995, before she could conduct the "checkride," she called in sick and never returned to work. Gotthardt's psychologist later diagnosed her as suffering from Post Traumatic Stress Disorder ("PTSD").

On September 13, 1993, Gotthardt sued Amtrak, alleging violations of Title VII including employment discrimination based on sex, hostile work environment sexual harassment, retaliation, and false imprisonment. We refer to this action, which covered events between 1991 and 1993, as *"Gotthardt I."* On July 5, 1995, after Gotthardt stopped working at Amtrak, she filed a second action alleging similar violations of Title VII [2] in the years up to and including 1995. The court consolidated this action, referred to as *"Gotthardt II,"* with *Gotthardt I,* and the consolidated cases went to trial.

In *Gotthardt I,* the district court [3] dismissed the retaliation and false imprisonment claims. The court then determined that Gotthardt had failed to prove employment discrimination based on sex, but had proved that Amtrak was liable for hostile work environment sexual harassment. It refused to award any damages, however, because Gotthardt had "failed to present testimony regarding the extent of her damages." Amtrak does not appeal the district court's finding of liability.

*Gotthardt II* was decided by a jury. The jury found against Gotthardt on her retaliation and sex discrimination claims, but for her on her hostile work environment sexual harassment claim, and awarded her compensatory damages of $350,000.[4] The district court instructed the jury that it could not find for Gotthardt on the hostile work environment claim unless "Gotthardt [had] proven ... that at least part of Amtrak's conduct constituting ... a hostile work environment took place *after* March 29, 1994." The district court, in its Findings of Fact and Conclusions of Law, adopted the jury's verdict. The court reduced the jury award of compensatory damages to $300,000, as required by 42 U.S.C. § 1981a(b)(3), which caps compensatory damages for Title VII claims.[5] After an evidentiary hearing, it calculated equitable relief. It found that Gotthardt's PTSD had rendered her unable to return to Amtrak and that, given her age and background, she would be unable to enter another career. It also found that, if Gotthardt had not developed PTSD, she would have qualified for the Capitol Run, and assumed that she would have remained in that position until she retired. It therefore awarded her $124,010.46 in back pay (representing the pay she would have received if she had qualified for the Capitol Run and remained in that position until the time the district court issued its findings, minus the disability benefits she already had received, plus prejudgment interest), and $603,928.37 in front pay (representing the pay and benefits she would have received if she had worked as a locomotive engineer on the Capitol Run from the date of the court's decision until she reached Amtrak's man-

**2.** Gotthardt also alleged violations of the California Fair Employment and Housing Act, Cal. Gov't.Code § 12900 *et seq.* ("FEHA"). For reasons that do not affect this appeal, the district court declined to address Gotthardt's FEHA claims.

**3.** The trial judge in both *Gotthardt I* and *Gotthardt II* was Magistrate Judge Joan S. Brennan, who sat by stipulation of the parties. *Gotthardt I* was not decided by the jury be-

cause its claims arose before Congress passed the November 1991 amendments to Title VII, which provided for jury trials.

**4.** The trial judge instructed the jury not to consider any evidence of Gotthardt's wage and benefit losses when it computed the damages award.

**5.** Amtrak has not appealed the $300,000 compensatory damages award.

datory retirement age of 70, discounted to present cash value). Gotthardt was 59 years old at the time of the award. Amtrak does not appeal the findings that Gotthardt was subjected to hostile work environment sexual harassment at the times alleged. The issues Amtrak raises on appeal all relate to remedies or damages.

## II. DISCUSSION

### A. *Section 1981a(b)(3)'s Cap on Compensatory Damages*

■ The district court concluded that section 1981a(b)(3), which caps compensatory damages in Title VII cases, does not apply to front pay awards. We review this conclusion of law *de novo. See Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc.,* 143 F.3d 1172, 1175 (9th Cir.1998); *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship & Training Comm.,* 94 F.3d 1366, 1369 (9th Cir.1996).

In 1991 Congress passed 42 U.S.C. § 1981a, which authorized compensatory and punitive damages in Title VII actions for the first time. *See Kolstad v. American Dental Ass'n,* — U.S. —, 119 S.Ct. 2118, 2123–24, 144 L.Ed.2d 494 (1999). Section 1981a(b)(3) caps the amount of these damages, stating that

the sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses ... shall not exceed [$300,000, for a defendant with more than 500 employees].

42 U.S.C. § 1981a(b)(3). Before Congress authorized compensatory and punitive damages in Title VII actions by passing section 1981a, another provision of Title VII, section 706(g) (codified at 42 U.S.C. § 2000e–5(g)), permitted courts to grant equitable relief to successful plaintiffs.

[T]he court may enjoin the respondent from engaging in [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g). In section 1981a, Congress specifically preserved section 706(g)'s grant of authority to provide such equitable relief.

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, *in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e–5(g) ]* ....

42 U.S.C. § 1981a(a)(1) (emphasis added). "Compensatory damages awarded under this section shall not include backpay, interest on backpay, or *any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964* [42 U.S.C.A. § 2000e–5(g) ]." *Id.* § 1981a(b)(2) (emphasis added).

The issue before us depends on how we characterize front pay. If, as Amtrak argues, front pay awards are "compensatory damages awarded under [section 1981a] for future pecuniary losses," *id.* § 1981a(b)(3), the district court should have capped the total amount of compensatory damages and front pay at $300,000. If, on the other hand, as Gotthardt claims, front pay is a form of equitable relief "authorized under section 706(g)" that Congress did not intend to limit when it passed section 1981a, *id.* § 1981a(b)(2), front pay does not fall within section 1981a's definition of "compensatory damages" and the district court correctly refused to cap Gotthardt's front pay award.

The circuits are divided on whether front pay falls within section 1981a's cap on damages. The Sixth Circuit has held that front pay falls within the cap. *See Hudson v. Reno,* 130 F.3d 1193, 1202–04 (6th Cir.1997), *cert. denied,* — U.S. —, 119 S.Ct. 64, 142 L.Ed.2d 50 (1998). The *Hudson* court relied on its construction of the plain language of section 1981a, also noting that section 706(g) did not specifi-

cally authorize front pay, that the Sixth Circuit usually had "treated front pay, in most contexts, as a legal, rather than an equitable, remedy," *id.* at 1203, and that it was difficult to imagine any "future pecuniary loss" other than the loss of future wages, *id.* at 1204. The Eighth, Tenth, and District of Columbia Circuits have rejected *Hudson*'s view, concluding that because front pay is an equitable remedy that is authorized under section 706(g), it does not fall within the section 1981a(b)(3) cap. *See Martini v. Federal Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1348–49 (D.C.Cir.1999); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 555 (10th Cir.1999), *petition for cert. filed,* 67 U.S.L.W. 3717 (U.S. May 12, 1999) (No. 98–1829); *Kramer v. Logan County Sch. Dist. No. R–1,* 157 F.3d 620, 626 (8th Cir.1998).

■ "When interpreting a statute, this court looks first to the words that Congress used. Rather than focusing just on the word or phrase at issue, this court looks to the entire statute to determine Congressional intent." *Sanchez v. Pacific Powder Co.*, 147 F.3d 1097, 1099 (9th Cir. 1998) (citations omitted). Our analysis of Congressional intent leads us to agree with the majority of circuits that have addressed this issue and conclude that Congress did not intend the statutory cap set forth in section 1981a to limit awards of front pay.

When Congress enacted section 1981a to authorize awards of compensatory and punitive damages in Title VII cases, it included language making it clear that the statute was not intended to cut back on the courts' existing authority to grant equitable relief to prevailing Title VII plaintiffs under section 706(g). *See* 42 U.S.C. §§ 1981a(a)(1), (b)(2). Before section 1981a's enactment, this and other circuits treated front pay as one of the forms of equitable relief authorized under section 706(g), using it to make plaintiffs whole when reinstatement was impractical. *See, e.g., Thorne v. City of El Segundo,* 802 F.2d 1131, 1137 (9th Cir.1986) (stating that

awards of front pay under Title VII "are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate"); *EEOC v. General Lines, Inc.,* 865 F.2d 1555, 1564 (10th Cir.1989); *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1473 (11th Cir.1985); *see also United States v. Burke,* 504 U.S. 229, 238–39 & n. 9, 112 S.Ct. 1867, 1873 & n. 9, 119 L.Ed.2d 34 (1992) (stating that Title VII allowed courts to grant equitable relief, but not "awards for compensatory or punitive damages," and noting that some courts had granted front pay as a form of equitable relief). We therefore conclude that Congress understood that front pay was one of the preexisting "type[s] of relief authorized under section 706(g)," 42 U.S.C. § 1981a(b)(2), that would not fall within the section 1981a(b)(3) cap. *Cf. Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (stating that when Congress incorporates a prior law into a new law, it "normally can be presumed to have had knowledge of the interpretation given to the incorporated law" by courts and administrative agencies).

■ The legislative history of section 1981a supports our conclusion that Congress *did not intend section 1981a(b)(3) to* restrict front pay awards. When Congress was considering section 1981a, Senator Kennedy, one of the bill's sponsors, stated that, "[c]ompensatory damages do not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964, *including front pay.*" 137 Cong. Rec. S15234 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy) (emphasis added). The chairman of the House subcommittee that drafted the bill, Representative Edwards, stated that "[d]amages awarded under [section 1981a] cannot include remedies already available under Title VII including backpay, the interest thereon, *front pay,* or any other relief authorized under Title VII." 137 Cong. Rec. H9527 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards) (emphasis added).[6]

---

6. The Equal Employment Opportunity Commission also has interpreted section 1981a to

Because section 1981a(b)(3) does not apply to front pay awards, the district court correctly refused to limit Gotthardt's front pay award on that basis.

## B. *The Determination that Front Pay Was Appropriate*

Amtrak contends that even if the section 1981a(b)(3) cap does not apply to front pay, the district court should not have awarded any front pay to Gotthardt. It claims that two of the district court's findings of fact were erroneous: that the debilitating PTSD that forced Gotthardt to go on medical leave in May 1995 could be attributed to Amtrak's wrongs and that the PTSD would render Gotthardt unable to work again for Amtrak. We conclude that both of these contentions are without merit.

First, Amtrak claims, Gotthardt did not prove that there was a causal connection between the sexually harassing hostile work environment created by Amtrak and the PTSD that forced her to leave her job.[7] To receive front pay, a Title VII plaintiff must show that her employer's violations of Title VII caused her loss of employment. *See Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1002 (10th Cir.1996) (stating that equitable remedies were not available to compensate for termination unless the plaintiff could show by a preponderance of the evidence that "she was forced to quit due to [gender]-based intolerable working conditions") (internal quotation omitted); *Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 332 (7th Cir.1993) (in Title VII cases arising before 1991 statute authorizing compensatory damages, "a victim of sexual harassment who has left her employer's employment cannot obtain a remedy unless she can prove that the harassment was the cause of her leaving"); *see also Landgraf v. USI Film Prods.,* 511 U.S. 244, 254, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229 (1994) (noting that "under prior law [allowing only equitable relief] a Title VII plaintiff could not recover monetary relief unless the discrimination was also found to have some concrete effect on the plaintiff's employment status").

We review the district court's findings of fact for clear error. *See Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995). When we conduct clear error review, "we must not reverse as long as the [district court's] findings are plausible in light of the record viewed in its entirety." *United States v. Alexander,* 106 F.3d 874, 877 (9th Cir.1997). We must bear in mind the trial court's opportunity to judge the witnesses' credibility. *See Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 665 (9th Cir.1996). The district court

exclude front pay from its cap.

> Because relief recoverable under § 706(g) is not deemed to be compensatory damages, complaining parties may recover full compensation for back pay, interest on backpay, frontpay, or any relief that would have been available under Title VII ... without inclusion in the caps. Although some may contend that frontpay is a "future pecuniary loss" to be included in the caps, the Commission disagrees. Frontpay is a type of "relief authorized under Title VII" and, therefore, is excluded from the definition of compensatory damages and is not included in the caps.

EEOC: Policy Guide on Compensatory and Punitive Damages Under 1991 Civil Rights Act, 8 Lab. Rel. Rep. Fair Empl. Prac. Manual (BNA) 405:7091, 7094 (July 7, 1992). When interpreting the provisions of a statute, we may defer to the interpretation of the agency charged with the statute's administration "unless it contravenes the express language of the statute or clear congressional intent." *Wilderness Soc'y v. Dombeck,* 168 F.3d 367, 370 (9th Cir.1999). In this case, however, we need not determine whether we should defer to the EEOC's view, because it is consistent with our understanding of Congress's intent.

7. Amtrak also argues that the jury found it liable only for a hostile work environment created in 1990 and 1991, and that the district court therefore could award equitable relief only for harms caused by Gotthardt's experiences in those years. In fact, however, the judge instructed the jury that "[y]ou may find for Gotthardt on any claim of ... hostile work environment only if Gotthardt has proven by a preponderance of the evidence that at least part of Amtrak's conduct constituting ... a hostile work environment took place after March 29th, 1994."

found the required causal connection between the hostile work environment and Gotthardt's debilitating medical condition when it stated that "defendant ... forced [Gotthardt] to go on medical leave with PTSD." Although Gotthardt had been treated for PTSD for a limited period before Amtrak subjected her to the hostile work environment,[8] the district court's finding of causation is plausible in light of the extensive testimony of Dr. Jeanne Rivoire, Gotthardt's treating psychologist and psychological expert, that the hostile environment at Amtrak caused Gotthardt's disability. We therefore will not disturb the finding.[9]

 Amtrak also argues that the district court should have ordered, at most, reinstatement rather than front pay, because Amtrak was able to offer Gotthardt one of several positions in a non-hostile work environment. We review for abuse of discretion decisions pertaining to whether to award remedies in Title VII cases, *see Eldredge,* 94 F.3d at 1369, including the determination of whether to award reinstatement or front pay, *see Cassino v. Reichhold Chems., Inc.* 817 F.2d 1338, 1346 (9th Cir.1987). Although reinstatement, when it is feasible, is "the preferred remedy" in a discrimination suit, *id.,* "[a]wards of front pay are appropriate when it is impossible to reinstate the plaintiff," *Thorne,* 802 F.2d at 1137. The evidence supports the district court's finding that Gotthardt's medical and psychological condition, by making her "unable to return to work for Amtrak" and "prevent[ing] her from obtaining employment in another field of work," would make reinstatement impossible. Dr. Rivoire testified that Gotthardt's ongoing impairment would render

her unable to perform any job; the trial court, which had the opportunity to observe her testimony, found it credible. The district court therefore did not abuse its discretion by ordering front pay instead of reinstatement.

### C. *The Calculation of the Front Pay Award*

Amtrak next argues that even if the district court correctly determined that Gotthardt was entitled to front pay, it incorrectly calculated the amount of front pay. Amtrak claims that the evidence did not support the district court's conclusion that Gotthardt would have qualified for the Capitol Run and worked steadily on that route until September 15, 2008, the date she would reach her mandatory retirement age of 70. It also claims that the district court abused its discretion by failing to take into account Gotthardt's duty to mitigate her damages by seeking other employment and to consider whether Gotthardt would be entitled to disability benefits.[10]

### 1. *Gotthardt's Projected Career Path at Amtrak*

 When calculating Gotthardt's front pay, the district court assumed that she would have qualified for the Capitol Run and worked as an engineer on that route. This calculation was appropriate only if Gotthardt would have qualified for this position absent the hostile work environment created by Amtrak.

> [I]f it is shown that the appellee was not qualified for the position, [then] neither back pay, nor so-called front pay, may be awarded . . . .

---

**8.** In February 1989, Gotthardt was working as a fireman on a train that hit four young people, killing them. The train crew was not at fault. After the accident, Gotthardt received treatment for PTSD for eleven months.

**9.** Amtrak argues that the district court should not have credited Dr. Rivoire's testimony over the competing testimony of Dr. Mandel, Amtrak's psychological expert. We see no evidence, however, that Dr. Rivoire was not

qualified as an expert or that the district court could not reasonably have found her testimony to be more convincing than Dr. Mandel's.

**10.** Amtrak also suggests that the district court should have considered the possibility that Amtrak's "well-publicized financial difficulties," would cause it to cease operations before 2008. Because Amtrak introduced no evidence concerning its financial prospects, this argument is without merit.

[A]n award of back pay or an order of reinstatement is appropriate only if the discrimination is a but for cause of the disputed employment action, and it follows that a showing of nonqualification would bar such relief.

*Fadhl v. City and County of San Francisco,* 741 F.2d 1163, 1166 (9th Cir.1984). The record supports the district court's finding that Gotthardt was an experienced engineer who "possessed the skills and ability to qualify for [the Capitol Run]." For example, senior Amtrak engineers who had trained or evaluated Gotthardt testified that she was a highly capable engineer, and there was evidence that the Capitol Run was less challenging than other Amtrak routes. Therefore, the court's conclusion that Gotthardt would have earned the Capitol Run position absent Amtrak's hostile work environment was not clearly erroneous.

 The district court also assumed, in calculating front pay, that Gotthardt would have worked steadily until her 70th birthday. Gotthardt had missed several months of work because of an injury (a severely cut finger) and disciplinary actions that were not related to the hostile work environment, receiving no pay for much of this time. The district court did not explicitly take this missed work into account in its findings of fact. A plaintiff's past work history may be relevant to calculating a front pay award when it suggests that the plaintiff might not have been employed steadily in the future.

[A plaintiff's duty to mitigate] is not the only reason for which a front pay award may be reduced to an amount less than a claimant's total projected earnings to age 70. A claimant's work and life expectancy are pertinent factors in calculating front pay.... The purpose of front pay ... is to ensure that a person who has been discriminated against ... is made whole, not to guarantee every claimant who cannot mitigate damages by finding comparable work an annuity to age 70.

*Anastasio v. Schering Corp.,* 838 F.2d 701, 709 (3d Cir.1988) (ADEA case). In this case, however, because there was no evidence that Gotthardt was particularly likely to suffer similar injuries or become subject to similar disciplinary suspensions, the district court did not err by declining to assume that her past absences indicated that she would miss work in the future.

2. *Gotthardt's Duty to Mitigate*

 A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future.

[F]ront pay awards ... must be reduced by the amount plaintiff could earn using reasonable mitigation efforts.... Thus, front pay is intended to be temporary in nature. An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing.

*Cassino,* 817 F.2d at 1347 (citations and quotations omitted). "Because of the potential for windfall, [front pay's] use must be tempered." *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1424 (4th Cir.1991). Although an eleven-year front pay award seems generous, the district court explicitly found that Gotthardt would be unable to work in the future, taking into account her age (59), her educational and vocational background, and, especially, her health. Dr. Rivoire's testimony supported the court's finding that Gotthardt's medical condition would render her unable to return to work. The district court did not commit clear error in crediting that testimony and finding that eleven years of front pay was required to make Gotthardt whole.

3. *Disability Benefits*

 Amtrak presented evidence that Gotthardt might, in the future, become entitled to disability benefits. The district court did not take such benefits' availability into account in its order. There is a split in the circuits as to whether district courts have the discretion to deduct the

present value of such future benefits from a front pay award or whether they are prohibited from making any deduction for such collateral benefits. The First Circuit takes the former position and the Sixth Circuit the latter. *Compare Lussier v. Runyon,* 50 F.3d 1103, 1107–11 (1st Cir. 1995) *with Hamlin v. Charter Township of Flint,* 165 F.3d 426, 433 (6th Cir.1999). We need not decide, however, whether to adopt the First Circuit's rule or the Sixth's. Either way, Gotthardt prevails; because Amtrak could only speculate as to whether Gotthardt was in fact qualified to receive any disability benefits, we cannot say that the district court abused its broad discretion by declining to reduce the front pay award to reflect the *possibility* that the benefits might become available.[11]

D. *The Denial of Back Pay in* Gotthardt I

■ In *Gotthardt I,* the district court rejected Gotthardt's claim of employment discrimination based on sex, but found that Gotthardt had been subjected to a sexually harassing hostile work environment. It awarded no back pay, however, finding that "Plaintiff bears the burden of proving the extent of her damages ... [and] Gotthardt failed to present testimony regarding the extent of her damages, whether compensatory or equitable." Gotthardt claims that this finding was clearly erroneous, because she presented pieces of evidence that proved she had lost up to 168 days of work. Amtrak does not contest that Gotthardt lost work days, and the district court discussed her absences in its findings of fact. Gotthardt, however, did not show that this lost work could be attributed to Amtrak's unlawful conduct. The district court noted this lack of causation evidence, stating that "Gotthardt did not present evidence of the number of hours that she would have worked 'but for' the alleged discriminatory conduct by Am-

trak." The district court's finding that Gotthardt did not demonstrate her damages was not clearly erroneous.

■ A plaintiff bears the burden of "proving the damages caused her. These damages are determined by 'measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant.'" *Horn v. Duke Homes,* 755 F.2d 599, 606 (7th Cir.1985) (quoting *Taylor v. Philips Ind., Inc.,* 593 F.2d 783, 786 (7th Cir.1979) (per curiam)). If the plaintiff shows these damages, the court should award back pay. *See Thorne,* 802 F.2d at 1133–34.

Gotthardt presented evidence that she lost work days during the relevant time period. First, Gotthardt testified, and the district court found, that Gotthardt was without a position from July 3 to October 31, 1991. Amtrak removed her from service in July 1991 because she had failed to qualify for a train route, the Santa Barbara run, after fifteen paid opportunities to learn the route. During two of the Santa Barbara runs in which Gotthardt failed to prove her ability to handle the route, including the last run before Amtrak took her out of service, Gotthardt was subjected to a hostile work environment. After three more attempts, Gotthardt qualified for the run in late October 1991. Second, Gotthardt testified that she was held out of service for 56 days in 1993 for a violation that only merited a punishment of 30 days.

Gotthardt, however, failed to present substantial evidence that the hostile work environment for which the district court held Amtrak liable caused these two absences. In rejecting Gotthardt's sex-based employment discrimination claim, the district court found that Amtrak had legitimate non-discriminatory reasons for removing Gotthardt from service between

11. Amtrak also claims that the district court erred in awarding back pay in *Gotthardt II.* Its arguments are similar to those it makes on the front pay issue: that the hostile work environment for which Amtrak was held lia-

ble did not cause Gotthardt's PTSD, that Gotthardt was not qualified for the Capitol Run, and that Gotthardt failed to mitigate her damages. We reject these arguments for the reasons discussed above.

July and October 1991. It stated that "Gotthardt failed to prove that she deserved to be qualified on the Oakland–Santa Barbara run," noting that non-Amtrak observers had concluded that she had failed to operate the train in a safe manner during a number of qualification runs. The record does not show that the district court erred in concluding that Gotthardt's lack of skill, rather than harassing conduct, caused Gotthardt's removal from work during this period.

Similarly, Gotthardt presented no evidence that the 26 extra days that she alleged Amtrak held her out of service had anything to do with Amtrak's hostile work environment. The district court rejected her claim that her punishment constituted sex discrimination, stating that "[t]he punishment that Gotthardt received for rules violations while operating the train was not disparate. Similar discipline was assessed against male employees assisting her as firemen." This finding also finds support in the record.

Although Gotthardt showed that she missed work, the record supports the district court's conclusion that the hostile work environment created by Amtrak did not cause her absence. Therefore, the district court did not err in finding that Gotthardt failed to prove the extent of her damages in *Gotthardt I* and refusing to award back pay.

### CONCLUSION

For the foregoing reasons, we AFFIRM the district court's orders.