**Efrain A. RAMIREZ, Plaintiff–Appellee,**

**v.**

**NEW YORK CITY OFF–TRACK BETTING CORP., Defendant–Appellant.**

No. 963, Docket 96–7673.

United States Court of Appeals, Second Circuit.

Argued Feb. 10, 1997.

Decided Feb. 24, 1997.

Kristin M. Helmers (Paul A. Crotty, Timothy J. O'Shaughnessy), Corporation Counsel of the City of New York, New York, N.Y. for Defendant–Appellant.

John R. Olsen, Olsen & Brown, New York, N.Y., for Plaintiff–Appellee.

Before: McLAUGHLIN, CALABRESI, and LAY,* Circuit Judges.

CALABRESI, Circuit Judge.

When summoned to bed by his bride, the early Renaissance master Paolo Uccello supposedly declined to interrupt his painting and suggested that she did not understand the sweet satisfaction that comes from trying to solve the intricacies of perspective. The complexities of discounting are almost as great but nowhere near as aesthetically pleasing. Still, they have caused many a lawyer to lose a good night's sleep. Fortunately, the basic rules for discounting damages in this circuit have been well established and explained in a series of opinions from the 1980's. Accordingly, we do little more today than apply what those cases have held to the facts before us.

## I. BACKGROUND

The plaintiff Efrain Ramirez, who has long suffered from psychiatric disabilities, was employed by the defendant Off–Track Betting Corporation ("OTB") for ten years beginning in 1981. His stepfather, Irwin Katz, was the OTB's chief financial officer until he was fired on February 22, 1991, allegedly due to his comments about discriminatory actions taken by the defendant's then-president. On May 16, 1991, Ramirez was involved in a physical altercation with one of his supervisors, and a few days later was hospitalized by his psychiatrist.

Ramirez requested and was granted a medical leave beginning September 25, 1991, and extending to January 24, 1992. According to OTB's policy, employees on medical leave collected no salary but received medical benefits. On October 31, 1991, OTB advised Ramirez that he had been placed on "inactive pay status" as of October 5, 1991, which meant the loss of his medical benefits. By letter dated April 6, 1992, OTB advised Ramirez that he had been discharged effective December 27, 1991. By letters dated July 15, 1992 and November 16, 1992, Ramirez requested permission to appeal the discharge. The record contains no evidence that OTB responded to these letters.

This action began on or about February 3, 1993. The case went to the jury on three theories—(1) that OTB had violated Title VII by discriminating against Ramirez because of his ethnicity; (2) that OTB had violated Title VII by retaliating against Ramirez for being Mr. Katz's stepson; and (3) that OTB had denied Ramirez due process of law in firing him. At trial, unrebutted testimony was in-

---

* The Honorable Donald P. Lay, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

troduced that Ramirez's psychiatric difficulties, which had not adversely affected his work during his tenure at OTB, had become so severe after his discharge that he was in effect unemployable. The jury ruled against the plaintiff on the first claim but in his favor on the second and third claims and awarded him $2.58 million. Because neither party requested a special verdict as to damages, the jury did not break this sum down into separate amounts for lost wages, medical expenses, and pain and suffering.

OTB timely moved for a new trial on the grounds that the summation by the plaintiff's attorney was improper and that the verdict was excessive. The district court declined to find the summation improper. It agreed, however, that the award for pain and suffering was shocking to the judicial conscience. In reaching that conclusion, the court first performed its own calculations to determine the amount that the jury must have awarded for lost income, medical costs, and pain and suffering. Without discounting economic losses to present value, it found that the jury reasonably could have awarded a maximum of $1,099,575 for lost wages and $334,800 for medical expenses. It then subtracted these sums from the $2.58 million verdict and concluded that the jury had given the plaintiff a pain and suffering award of $1,145,625. Deeming that any award greater than $500,-000 for pain and suffering would, in this case, shock the conscience, the court ordered a remittitur of $645,625. The plaintiff agreed to the remittitur, and, hence, to damages in the amount of $1,934,375. This appeal ensued.

## II. DISCUSSION

On appeal, OTB contends that the proceedings were infected with prejudicial error and therefore that a new trial on damages should be ordered without the option of a remittitur. In the alternative, OTB maintains that the remittitur should be increased.

### A. The District Court Did Not Err in Offering the Plaintiff a Remittitur

■ A remittitur should be granted only where the trial has been free of prejudicial error. *Werbungs Und Commerz Union*

*Austalt v. Collectors' Guild, Ltd.,* 930 F.2d 1021, 1027–28 (2d Cir.1991). If, instead, the record establishes that the jury's verdict on damages was not only excessive but was also infected by fundamental error, remittitur is improper. *See id.* In such a case, the judgment of the district court should be vacated and the cause remanded for a new trial on damages. *See id.*

■ The defendant argues on three unpersuasive grounds that the trial was infected with prejudicial error. First, the defendant maintains that the plaintiff's attorney injected bias into the proceedings by asking the jury to "send a message" with its damage award. Specifically, the defendant claims that these comments were a plea to the jury to award *de facto* punitive damages contrary to the law. This contention lacks merit. As the trial court stated, "counsel's comments merely suggested that the jury should send a message that this country's civil rights laws are vigorously enforced and that plaintiff should be fully compensated despite the fact that the defendant is a government agency, concepts that are totally appropriate." The trial court also properly noted that "the fact that no objection was made to counsel's closing at the time is telling."

Second, OTB maintains that Ramirez's attorney erred in suggesting to the jury that it should award Ramirez $10 million. OTB correctly points out that we have previously expressed concern that lawyers may influence juries unduly when they mention particular damage awards. *Mileski v. Long Island Rail Road Co.,* 499 F.2d 1169, 1172–74 (2d Cir.1974). Yet despite this concern, this court has not adopted a ban on suggestions of damage amounts. The attorney's specification of a particular sum, however ill-advised, did not rise to the level of prejudicial error, especially where, as here, no objection was made when the sum was suggested.

■ Finally, OTB claims that the sheer magnitude of the verdict demonstrates that the jury was motivated by prejudice. It is true that the size of a jury's verdict may be so excessive as to be "inherently indicative of passion or prejudice" and to require a new trial. *Auster Oil & Gas, Inc. v. Stream,* 835

F.2d 597, 603 (5th Cir.1988). The cases in which the jury's award is seen to reflect prejudice, however, are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court. *See, e.g., id.* (district court ordered $4.35 million remittitur after jury awarded $5 million); *Wells v. Dallas Indep. School Dist.,* 793 F.2d 679, 683–84 (5th Cir.1986) (district court ordered $1.65 million remittitur after jury awarded $1.9 million). The remittitur in this case was a far lower fraction of the total verdict, and will be so even after discounting. The verdict is not so excessive as to demonstrate prejudice in itself.

Because the trial is not infected by error, a remittitur, in lieu of a new trial, was properly granted.

### B. The District Court Erred in Calculating the Remittitur

OTB contends in the alternative that the court should order a new trial with the option of an increased remittitur. OTB believes that the remittitur should be increased because (1) the jury erroneously found that Ramirez was unable to work, and (2) the district court did not explicitly apply a discount rate in calculating its remittitur.

 The first objection need not detain us long. The plaintiff produced a mass of unrebutted testimony at trial that showed that he was functional before his termination and non-functional thereafter. For example, as noted by the district court, the plaintiff's treating psychiatrist testified that the plaintiff had been able to work despite his psychiatric condition prior to the termination proceedings, but that afterwards the plaintiff was "unable to function" and "never got better." In addition, Ramirez testified, *inter alia,* that he "ha[d not] really recovered completely" from the trauma of the proceedings. There was thus ample evidence from which the jury could find that Ramirez was unable to work.[1]

The second objection is more troubling. This circuit has stated that "damages for loss of earnings that would have been received in the future must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future." *Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742, 746 (2d Cir.1988). Where, as here, the parties have adduced no evidence relating to the discount rate, and have made no showing that the undiscounted lost wages figure has been adjusted upward to cover future inflation, we have suggested a discount rate of 2% per year. *See, e.g., id.; DeChico v. Metro-North Commuter R.R.,* 758 F.2d 856, 860 (2d Cir.1985); *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 40 (2d Cir.1980).[2] This is because we have concluded that the historic time value of money in the United States (*i.e.* the rate of interest cleansed of any inflation component) has fluctuated around that figure.[3] *See Oliveri,* 849 F.2d at 746. This rate is a suggestion rather than a requirement, *see Doca,* 634 F.2d at 40, but we have noted that downward adjustments to this rate must be justified—"the lowest discount rate we are willing to approve, in the absence of historical data justifying a different rate, is 2%." *Id.*

---

1. The defendant's argument that the reduced award of $500,000 for pain and suffering was still shocking to the judicial conscience doubtless arises from its disagreement with the premise that the plaintiff was rendered unemployable for life. Given that there was ample evidence to support the jury's conclusion that the plaintiff was indeed rendered permanently non-functional, we find that an award of $500,000 is well within the discretion of the district court.

2. Some other circuits hold, instead, that where neither party has introduced any evidence about the proper discount rate, no actual discounting is necessary. *See, e.g., Miller v. Union Pac. R.R. Co.,* 900 F.2d 223, 226 (10th Cir.1990); *Alma v.*

*Manufacturers Hanover Trust Co.,* 684 F.2d 622, 626 (9th Cir.1982).

3. The determination of the time value of money cleansed of inflation may become significantly easier in the future. The United States Treasury Department recently released "inflation-indexed" bonds that are meant to give both a yield and an ultimate principal payback that are adjusted for inflation. The interest on such bonds would be highly significant evidence of the inflation-free time value of money, at least for the life of the bonds. *See* Gregory Zuckerman, *Inflation Notes Will Offer Fed Forecast Tool,* Wall St. J., Feb. 3, 1997, at C1.

The defendant argues, however, that in this case we should apply a discount rate *higher* than 2%. OTB bases this argument on the premise that Judge Preska adjusted the gross wage figure to cover future inflation when she assumed that the plaintiff's wages would increase by 6% per year. If this were true, the appropriate discount rate would be the 2% that we have postulated plus whatever inflation adjustment had already been made in determining lost wages. *See Oliveri*, 849 F.2d at 746 (noting that if estimated future earnings are already adjusted for inflation, any further downward adjustment for inflation in the discount rate would result in double counting). The record, however, does not support the defendant's claim that the 6% figure used by the district court incorporated an estimated inflation rate. The only evidence the defendant adduces for its claim is that Judge Preska derived the 6% figure in part from wage increases included in past collective bargaining agreements. In effect, the defendant wants us to say that inflation is *always* "factored in when parties enter into collective bargaining agreements." This we are unwilling to do. We do not doubt that such agreements often reflect expected increases in the cost of living. But they may instead be primarily based on relative bargaining power at the time of the agreement, or on expected changes in worker productivity.

■ In the absence of an express cost-of-living adjustment in a collective bargaining agreement used to determine future wages, it is up to the party arguing for a higher than 2% discount rate to show the degree to which inflation affected the wage figure. The parties in the case before us did not point to anything in the record that indicates that past collective bargaining agreements factored in inflation. Nor did Judge Preska suggest that her 6% figure took inflation into account. Accordingly, the reasoning of our past cases, proposing a 2% discount rate, applies.

■ In her calculation of the maximum amount of economic damages that a reasonable jury could have awarded, Judge Preska did not make any explicit adjustment for the time value of money. We therefore must assume that Judge Preska either did not consider the time value of money at all or considered it and found the discount rate to be 0%. Both alternatives are problematic. If she did not consider the time value of money, she violated this circuit's discounting requirement. If she found the discount rate to be 0%, she erred in failing to adduce data to support that result.[4]

It follows that the remittitur was likely deflated. Judge Preska derived the jury's award for pain and suffering by subtracting her estimates of the proper awards for lost income and medical cost from the total verdict. The awards for lost income and medical cost, however, were not expressly discounted to present value.[5] If the correct discount rate is higher than 0%, Judge Preska inadvertently overestimated the amount of lost income and medical costs that the jury could properly have awarded, and hence she underestimated the jury's award for pain and suffering. Given that she computed the remittitur as the difference between the jury's award for pain and suffering and the $500,000 she deemed acceptable, this means that she understated the required remittitur.

We therefore vacate and remand solely on the issue of the discount rate to be applied to

---

4. This alternative finds support in the fact that Judge Preska had previously instructed the jury that it should discount to present value. But if Judge Preska did intend to apply a 0% discount rate, she needed to provide a justification for doing so.

5. The defendant does not allege that the damages for pain and suffering need to be discounted. Although other circuits do not require discounting of future non-pecuniary damages, *see Oliveri*, 849 F.2d at 751, this circuit has expressed a "clear preference" for discounting, *id.* The standard for discounting when future non-pecuniary damages are involved, however, appears to be lenient—"all that is required for awards of non-pecuniary future damages is that the time value of money be taken into account." *Id.* (citations, brackets, and internal quotation marks omitted). Judge Preska did caution the jury to discount to present value, and we cannot assume that her determination that $500,000 was acceptable did not take the time value of money into account. In any event, because the defendant did not preserve the issue, we need not address it further.

the damage awards for loss of income and medical fees.

### III. CONCLUSION

We affirm the district court's grant of a remittitur, but vacate the judgment as to the amount of the remittitur and remand for a new computation that incorporates the proper discount rate. We note that there is no occasion for the introduction of new evidence pertaining to the discount rate. Judge Preska should be free, in the absence of existing historical evidence justifying her prior decision, to discount lost income and medical costs at the suggested 2% rate, taking into account, of course, when the medical expenses could be expected to be incurred and when the lost wages would have been earned. We see no reason to, and do not, alter or amend the dates from which interest has accumulated pursuant to the trial court's previous judgment. That interest, of course, should be calculated based on the newly computed damage awards incorporating the proper discount rate.