OPINION OF THE COURT
Jack M. Battaglia, J.
In its verdict, the jury determined that plaintiff Indra Boo-dram was subjected to a hostile work environment because of her sex; that the hostile work environment was acquiesced in or condoned by her employer, defendant Brooklyn Developmental Center (see Matter of State Div. of Human Rights v St. Elizabeth’s Hosp., 66 NY2d 684, 687 [1985]); and that Ms. Boodram suffered damages as a proximate result of the hostile work environment, which the jury assessed at a total of $798,000. At trial, after all of the evidence was in, the Center moved pursuant to CPLR 4401 for judgment as a matter of law, and, following the preferred practice (see Matter of Austin v Consilvio, 295 AD2d 244, 246 [1st Dept 2002]), the court reserved decision on the motion. After the jury’s verdict, the Center moved pursuant to CPLR 4404 (a) to set aside the verdict in the interest of justice and because the verdict was against the weight of the evidence.
In her verified complaint, Ms. Boodram alleged two causes of action — one against the Center, her former employer, and one against a named codefendant, Joseph Adiego, a former coworker. Both causes of action alleged violation of the Human Rights Law (Executive Law § 296 [1]), based upon sexual harassment of Ms. Boodram by Mr. Adiego. Just before trial began, Mr. Adiego moved for dismissal as against him, on the ground that he could not be liable for a violation of Executive Law § 296 (1). (See Patrowich v Chemical Bank, 63 NY2d 541 [1984].) The court denied the motion, ruling that the verified complaint sufficiently stated a cause of action against Mr. Adiego. After all of the evidence was in, Mr. Adiego again moved for dismissal, and the court granted the motion, ruling that Ms. Boodram had not established prima facie that Mr. Adiego was liable under Executive Law § 296 (1), or under an aiding and abetting provision at section 296 (6).
The Center asserts three primary grounds in support of its motions: that Mr. Adiego’s presence as a defendant prejudiced the Center; Ms. Boodram’s lack of credibility on several material matters; and that the jury’s award for damages cannot stand. (See defendant Brooklyn Developmental Center’s mem of law in support of its motions.) The standards governing the Center’s motions are familiar.
*576 “Pursuant to CPLR 4404 (a) a ‘court may set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence.’ There must be ‘no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial’ in order to set aside a judgment and direct judgment in favor of a party entitled to judgment ... A jury verdict should not be set aside and a new trial ordered ‘unless the jury could not have reached the verdict on any fair interpretation of the evidence.’ ” (Lepatner v VJM Home Renovations, 295 AD2d 322, 323 [2d Dept 2002] [citations omitted].)
[The court determines that neither Mr. Adiego’s “presence as a defendant” during the trial, nor any alleged exaggerations, inaccuracies or inconsistencies in Ms. Boodram’s testimony, require that the verdict be set aside.]
It is important to note that the Center does not directly challenge the jury’s determination that Ms. Boodram was subjected to a hostile work environment by reason of Mr. Adiego’s conduct or its determination that the Center acquiesced in or condoned that environment. The Center makes no showing that, if all of the alleged exaggerations, inaccuracies and inconsistencies were resolved in its favor, the jury’s determinations on these issues would be against the weight of the evidence.
Ms. Boodram argued to the jury that the hostile work environment to which she was subjected has caused her, and will continue to cause her, damages. The jury accepted her argument, awarding $86,000 as damages for mental suffering, emotional and psychological injury through trial, $86,000 as damages for such suffering and injury for 14 years beyond trial, $234,000 for loss of earnings through trial, and $392,000 for loss of earnings for 14 years beyond trial.
Evidence at Trial
In June 1992, Ms. Boodram had been employed at the Center for approximately 19 years. She was 37 years old (48 at the time of the trial), and worked directly with the developmentally disabled adults who resided and were taught at the Center. One of her supervisors testified that Ms. Boodram “was a very good *577 worker . . . worked very hard . . . was very enthusiastic, and . . . very kind to the disabled students . . . always cheerful, always friendly.” (Transcript at 310.)
Beginning in June and continuing into early November 1992, Mr. Adiego engaged in a pattern of behavior that Ms. Boodram characterized throughout her testimony as “stalking” and “grabbing.” Mr. Adiego would watch her, follow her, enter her classroom, and touch her on the buttocks and chest. The frequency was greatest in June, and there was a gap in September, but Ms. Boodram estimated that there could have been 25 incidents over the period. In early November, Mr. Adiego startled her, she fell, and she sustained injuries sufficient to require “occupational injury leave.” She never returned to work at the Center after mid-November.
Three of Ms. Boodram’s coworkers at the time testified at the trial, and generally confirmed her account. One coworker testified that Mr. Adiego entered the classroom more than 20 times and that he would touch Ms. Boodram “with regularity” (transcript at 189), including once on the buttocks. Another coworker testified to three incidents of touching, twice on the buttocks, once on the breast. After Ms. Boodram complained, one of her own supervisors and Mr. Adiego’s supervisor observed Mr. Adiego’s behavior, although not any touching. The Center’s affirmative action administrator, responsible for the Center’s compliance with its sexual harassment policy, conducted an investigation and found at least six Center employees who observed Mr. Adiego’s behavior.
Ms. Boodram complained to Mr. Adiego’s supervisor three times, and, she testified, she complained numerous times to her own supervisors and to the deputy director of the Center. Ms. Boodram’s husband also testified to complaints he made to Mr. Adiego’s supervisor, one of Ms. Boodram’s supervisors, and the deputy director. The supervisors and the deputy director testified, and did not dispute that complaints were made. Indeed, when Mr. Adiego’s supervisor confronted him after Ms. Boo-dram’s complaint to her, Mr. Adiego acknowledged behavior short of touching, and offered the explanation that he was investigating thefts and Ms. Boodram’s possible involvement.
One area of disagreement at trial, however, concerned the substance of the complaints. Ms. Boodram and her husband testified that they complained that Mr. Adiego’s behavior included touching, but the supervisors and the deputy director denied that. The significance of the discrepancy for purposes of *578 damages would be limited to whatever inference might be drawn from any failure to specify touching as to whether and how frequently touching occurred.
Ms. Boodram’s coworkers testified to their observations of the effect that Mr. Adiego’s behavior had on Ms. Boodram, characterizing the effects as “shocked,” “angry,” “upset,” “wasn’t eating,” and “like she wants to cry.” (Transcript at 74-78, 183, 210, 332.) Ms. Boodram complained to them of headaches, upset stomach, and nervousness as a result of Adiego’s behavior. Ms. Boodram’s husband also testified about the effects on Ms. Boo-dram of her situation at work, including personality changes and interference with Ms. Boodram’s relationships with him, their daughter and their friends. He also described insomnia and loss of appetite.
One of the coworkers spoke to Ms. Boodram shortly after she stopped working at the Center, and Ms. Boodram explained that the situation with Adiego made her “sick,” such that “she can hardly function.” (Transcript at 219-220.) The affirmative action administrator also spoke to Ms. Boodram at that time and found that she displayed symptoms associated with sexual harassment, namely, “upset, crying,” “anxious.” (Transcript at 687.)
Ms. Boodram’s own testimony focused more on the details of Mr. Adiego’s behavior than its effects, although the highly emotionally state that she displayed several times during her testimony may also have been assessed by the jury. She testified to nightmares and panic attacks that still persist. She did not remember, however, taking time off during the relevant period because of Mr. Adiego’s behavior, and it appears from other evidence that she did not.
In the fall of 1992, she saw a psychiatrist, Dr. Melvin Shulman, who retired in 1993, and she began treating with another psychiatrist, Dr. Francine E. San Giovanni. Ms. Boodram’s testimony at trial concerning psychiatric treatment prior to June 1992 was, at best, confused and was inconsistent with her deposition testimony. Except for her testimony, however, there was no medical evidence as to her psychological or emotional condition prior to her treatment with Dr. Shulman.
Ms. Boodram testified that she did not return to work at the Center because the physical injuries from the fall prevented her from meeting the requirements of the job, and because she was “afraid of what had happened would happen again.” (Transcript at 1129.) “There’s always a fear that what happened could hap *579 pen again cause nothing was done to assure me that I was safe.” (Transcript at 1136.) “For that same reason,” she did not consider a job somewhere else; “[a]lso it’s very difficult for me to concentrate because of the incident.” (Id.) Despite expressing a willingness to work “[i]f there was some insurance that I was going to be safe” (id.), she acknowledged that at no time since 1992 had she looked for any employment outside the home. And at her deposition, Ms. Boodram noted only her physical injuries as preventing her return to work.
Dr. San Giovanni’s testimony at trial was supported with her handwritten notes of the first visit with Ms. Boodram on September 14, 1993 and subsequent visits through November 1999, with typewritten notes of subsequent visits until her last visit on April 6, 2001, and with several narrative reports. Dr. San Giovanni saw Ms. Boodram twice each month until some time in 1995-1996, when the visits were reduced to once a month, except for a gap in treatment from October 1998 through June 1999 because Ms. Boodram’s insurer would not pay for the visits.
In a report dated October 9, 1993, Dr. San Giovanni diagnosed Ms. Boodram with post-traumatic stress disorder (PTSD) with secondary depression, and her diagnosis was the same when she testified at trial. A report dated November 25, 1992 by Dr. Shulman had diagnosed Ms. Boodram with “Chronic Stress Disorder . . . severe, disabling.” Dr. Shulman “advised her to stop work immediately,” since she could not “emotionally cope with the stresses at work.”
Dr. San Giovanni’s notes indicate that Ms. Boodram told her of the stalking and that Mr. Adiego once touched her breast and once touched her rear end. Reviewing her notes over the course of her treatment of Ms. Boodram, Dr. San Giovanni testified to a symptomology that included insomnia, weight loss, intense fear, feelings of helplessness, hypervigilance to danger, difficulty leaving home or the immediate neighborhood, panic attacks, nightmares, and depression. She found, however, an overall improvement after about the first three years, consistent with the reduction in visits to once each month.
Dr. San Giovanni described how the events and symptoms that Ms. Boodram related to her led to the diagnosis of post-traumatic stress disorder. She explained that approximately half of those who develop the disorder will recover within six months, but that for others the disorder is chronic and “could be a lifetime.” (Transcript at 1029.) She also explained that Ms. *580 Boodram’s depression came with an awareness of how much she had lost because of her experience with Mr. Adiego, particularly, “a job that she really loved.” (Transcript at 979.) “[S]he thought she had lost a lot of ground . . . [L]ife didn’t look particularly optimistic to her.” (Transcript at 988.)
At trial, Dr. San Giovanni testified that the facts and circumstances and symptoms that Ms. Boodram related and her diagnosis of Ms. Boodram were “consistent.” (Transcript at 990-991.) In her October 9, 1993 report, Dr. San Giovanni stated that Ms. Boodram’s “illness is 100% related to the prolonged period of stress on her job and the fear of serious harm which accompanies being stalked.”
In that same report, Dr. San Giovanni characterized Ms. Boo-dram as “completely disabled,” a characterization she repeated in subsequent reports into 1997 and that she repeated several times at trial. She explained that “jobs . . . want some form of reliable people immediate [sic] to be able to show up, do what they’re supposed to do, concentrate on the tasks at hand, follow instructions. I didn’t think she could do that consistently over time.” (Transcript at 1003.)
In February 1998, Dr. San Giovanni completed a mental impairment questionnaire for Ms. Boodram, in which she was asked to indicate the extent to which Ms. Boodram possessed various mental abilities and aptitudes to do unskilled work, semiskilled and skilled work, and particular types of jobs. For 25 listed abilities and aptitudes, Dr. San Giovanni indicated that Ms. Boodram possessed “poor or none” for 22 of them. She indicated that Ms. Boodram’s degree of limitation in maintaining social functioning was “extreme,” and that her “deficiencies of concentration, persistence or pace” were “constant.”
In a May 25, 1994 report that Dr. San Giovanni referred to during her testimony, and in subsequent reports into 1997, she characterized Ms. Boodram’s condition as “permanent.” When Dr. San Giovanni stopped treating Ms. Boodram in April 2001, her prognosis for Ms. Boodram was “basically that she would stay the same. I didn’t think that she would show any additional improvement of any significant degree.” (Transcript at 980.) At that time, she was still taking prescription medications, namely, Zoloft, Elavil and Ativan, which are used to treat post-traumatic stress disorder, depression, and panic attacks, respectively.
Dr. San Giovanni’s diagnosis was contradicted in major part by the opinion of the Center’s psychiatric expert, Dr. David A. Helperin. Dr. Helperin met with Ms. Boodram for a three-hour *581 evaluation on May 1, 2001, and his findings are described in a May 23, 2001 report. Dr. Helperin diagnosed Ms. Boodram as a “person who appeared to be slightly depressed and seemed to be going over and over again what happened to her in terms of work and her supervisors not backing her up ... I thought that she had an obsessive compulsive personality disorder.” (Transcript at 744.) Dr. Helperin found no reason to believe that Ms. Boodram “suffers from any disorder that would be caused by the fact that she was allegedly followed at work.” (Transcript at 782.)
Dr. Helperin expressly disagreed with Dr. San Giovanni’s diagnosis of post-traumatic stress disorder. But, with one exception, neither in his testimony at trial nor in his report did he identify any factors that he considered inconsistent with that diagnosis. Only one remark by Ms. Boodram (concerning not looking for Mr. Adiego) is identified as being inconsistent with post-traumatic stress disorder. Dr. Helperin seems to have been impressed with Ms. Boodram’s apparently having told him that “[s]he works at home in a jewelry business with her husband.” (Transcript at 749-750.) This is significant because “she was able to work and she was functioning . . . [I]t seemed like she was functioning well.”
Dr. Helperin’s credibility with the jury may have been affected by his affiliation with the False Memory Syndrome Foundation, an organization that has apparently been active in seeking to undermine claims of sexual abuse.
Mental Suffering, Emotional and Psychological Injury
There are relatively few state court opinions addressing damages in private lawsuits under the Human Rights Law. When considering a challenge to a jury verdict in a private action, at least one court has found “guidance” in the standards of review used when considering awards for emotional distress made by the Commissioner of Human Rights. (See Gleason v Callanan Indus., 203 AD2d 750, 751 [3d Dept 1994].) But it is important to keep in mind that those standards were developed in the context of “deference to the assessments of the Commissioner,” supported by the “discretion vested in the agency to achieve [the statutory] objectives” and the agency’s “special experience in weighing the merit and value of such claims.” (See Matter of New York City Tr. Auth. v State Div. of Human Rights, 78 NY2d 207, 215-216 [1991].) Thus, the “Commissioner’s factual findings as to the existence of mental anguish as a consequence of unlawful discrimination” will be accepted by a reviewing court *582 “when supported by sufficient evidence on the record considered as a whole.” (Id. at 216.) “Sufficient evidence has been interpreted to mean substantial evidence.” (Burlington Indus, v New York City Human Rights Commn., 82 AD2d 415, 417 [1st Dept 1981].)
Moreover, “the extremely strong statutory policy of eliminating discrimination gives the Commissioner greater discretion in effecting an appropriate remedy than under strict common-law principles.” (New York City Tr. Auth. v State Div. of Human Rights, 78 NY2d at 216.) Because of that policy, “an aggrieved individual need not produce the quantum and quality of evidence to prove compensatory damages he would have had to prove under an analogous provision.” (Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 NY2d 143, 147 [1974].) “The remedial nature of the statute evidences a legislative intent to compensate fully victims of employment discrimination.” (Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 25 [2002].)
And so, “[m]ental injury may be proved by the complainant’s own testimony, corroborated by reference to the circumstances of the alleged conduct”; but “[b]eyond the fact of mental anguish caused by discriminatoiy conduct, there must be some evidence of the magnitude of the injury.” (New York City Tr. Auth. v State Div. of Human Rights, 78 NY2d at 216-217.) The reviewing court must determine “whether the relief was reasonably related to the wrongdoing, whether the award was supported by evidence before the Commissioner, and how it comparéis] with other awards for similar injuries.” (Id. at 219.) The court may “apply objective criteria such as the duration of a complainant’s condition, its severity or consequences, any physical manifestations, and any medical treatment.” (Id. at 218; see also Matter of Kondracke v Blue, 277 AD2d 953, 954 [4th Dept 2000]; Matter of Manhattan & Bronx Surface Tr. Operating Auth. v New York State Exec. Dept., 220 AD2d 668, 669-670 [2d Dept 1995]; Matter of A.S.A.P. Personnel Servs. v Rosa, 219 AD2d 648, 649 [2d Dept 1995]; Gleason v Callanan Indus., 203 AD2d at 752.) As in the law of emotional distress generally, the “guarantee of genuiness” might ultimately be found “in the circumstances of the case.” (See Ferrara v Galluchio, 5 NY2d 16, 21 [1958]; Slotkin v Mercedes Benz of N. Am., 269 AD2d 588, 589 [2d Dept 2000].)
The Center contends that the jury’s award here for future emotional distress (as well as a portion of the award for past *583 emotional distress) is “legally insufficient” because “[p]laintiff offered nothing but her own testimony to establish emotional injury for the time period after April 2001” (citing Annis v County of Westchester, 136 F3d 239, 249 [2d Cir 1998]; see defendant Brooklyn Developmental Center’s mem of law at 29). Generally, federal case law under title VII of the Civil Rights Act of 1964 (42 USC § 2000e et seq.) may be used to resolve issues under the Human Rights Law. (See Aurecchione v New York State Div. of Human Rights, 98 NY2d at 26.) The two statutes “address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately enjoy the same standards of recovery.” (Id. at 26.) To the extent that under federal law “[a] plaintiff’s subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages” (Patrolmen’s Benevolent Assn, of City of N.Y. v City of New York, 310 F3d 43, 55 [2d Cir 2002]), it appears less generous to the claimant than the New York standards described above, at least when the award is made by the Commissioner. In any event, federal law would permit plaintiff’s testimony to be “substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiffs distress ... or the objective circumstances of the violation itself.” (Id. at 55.)
[The court reviews state and federal court decisions addressing awards for emotional distress as a result of sexual harassment, and concludes that New York state courts have reduced awards when the only evidence on the issue is the complainant’s testimony, unsubstantiated by any medical or other objective evidence; that the Appellate Division has sustained substantial awards; and that federal courts reviewing jury verdicts for emotional distress reach results not very different from those confirmed by New York state courts when reviewing awards by the Commissioner of Human Rights.]
Evidence of post-traumatic stress disorder has supported substantial awards for emotional distress in sexual harassment cases in federal courts. (See O’Rourke v City of Providence, 235 F3d 713, 733-734 [1st Cir 2001] [$275,000]; Gotthardt v National R.R. Passenger Corp., 191 F3d 1148, 1152, 1155 [9th Cir 1999] [$300,000]; Baty v Willamette Indus., 172 F3d 1232, 1244 [10th Cir 1999] [$300,000 compensatory and punitive]; Lockard v Pizza Hut, Inc., 162 F3d 1062, 1075 [10th Cir 1998] [$200,000].) The amount of the award may reflect evidence of future consequences. (See, for example, O’Rourke v City of Prov *584 idence, 235 F3d at 734 [PTSD “probably permanent”].) In cases that have not involved sexual harassment, New York courts have also upheld substantial awards for emotional distress with evidence of post-traumatic stress disorder. (See Blakesley v State of New York, 289 AD2d 979 [4th Dept 2001] [$200,000]; McKay v Ciani, 288 AD2d 587 [3d Dept 2001] [$375,000].)
The New York discrimination cases do not explicitly award damages for “future” emotional distress. It seems likely, however, that evidence of the continuation of the emotional distress or permanence of the psychological injury is reflected in the amounts that the Commissioner awards or that reviewing courts sustain. For example, in Matter of New York City Tr. Auth. v State Div. of Human Rights (181 AD2d 891 [2d Dept 1992]), in upholding an award of $450,000 in a sexual harassment case, the Court noted evidence that the plaintiffs anguish would persist for the remainder of her life (see id. at 895; see also Ramirez v New York City Off-Track Betting Corp., 112 F3d 38, 41 n 1 [2d Cir 1997] [upholding $500,000 award for pain and suffering when plaintiff was “rendered permanently nonfunctional” by psychiatric condition]). On the other hand, courts note the lack of evidence as to “duration” when they reduce the amount awarded by the Commissioner. (See, for example, A.S.A.P Personnel Servs. v Rosa, 219 AD2d at 649; Matter of New York State Dept, of Correctional Servs. v State Div. of Human Rights, 207 AD2d 587, 587-588 [3d Dept 1994].) Lost Earnings
The requirements that the Commissioner’s remedy bear a reasonable relationship to the wrongdoing, be supported by substantial evidence, and be comparable to similar remedies for similar injuries are not restricted to monetary awards for emotional distress, but apply to all remedies the Commissioner is authorized to order. (See Matter of Imperial Diner v State Human Rights Appeal Bd., 52 NY2d 72, 79 [1980]; Matter of Holland v Edwards, 307 NY 38, 46 [1954]; Matter of Young Fu Hsu v New York State Div. Human Rights, 241 AD2d 913, 913 [4th Dept 1997].)
An award of back pay will be sustained when not “so arbitrary and capricious as to constitute an abuse of discretion,” as such an award “would seem to be a rather normal sanction to be imposed.” (Matter of Mize v State Div. of Human Rights, 33 NY2d 53, 55-56 [1973]; see also Imperial Diner v State Human Rights Appeal Bd., 52 NY2d at 79; Rio Mar Rest, v New York State Div. of Human Rights, 270 AD2d 47, 48 [1st Dept 2000]; *585 Matter of Grand Union Co. v Mercado, 263 AD2d 923 [3d Dept 1999]; Young Fu Hsu v New York State Div. of Human Rights, 241 AD2d at 913; Matter of Bronx County Med. Group v Lassen, 233 AD2d 234 [1st Dept 1996]; 121-129 Broadway Realty v New York State Div. of Human Rights, 48 AD2d 975, 976 [3d Dept 1975]; Ryan v New York State Thruway Auth., 889 F Supp 70, 81 [ND NY 1995] [plaintiffs claim that “she was unable to act on . . . offers (of employment) because of . . . post traumatic stress disorder, caused by” sexual harassment presented jury issue as to back pay].) In a private action for retaliatory discharge because of plaintiffs complaint of sexual harassment, the court upheld a jury award of lost earnings, apparently back pay, finding that the award was warranted and not excessive. (See Gleason v Callanan Indus., 203 AD2d at 753.)
Interestingly, however, this court has not found any decision reflecting an award by the Commissioner for front pay or future lost earnings, and the Commissioner’s refusal to make such an award has been sustained as “an appropriate exercise of discretion.” (See Georgeson & Co. v Stewart, 267 AD2d 126, 127 [1st Dept 1999]; see also Levy v City Commr. on Human Rights, 196 AD2d 214, 217 [1st Dept 1994], affd 85 NY2d 740 [1995] [“not unreasonable ... to deny . . . request for future earnings”].) But in a recent private action involving a plaintiff diagnosed with post-traumatic stress disorder, but not resulting from harassment or other discriminatory conduct, an award representing future lost earnings was sustained; “giving due deference to the jury’s assessment of credibility,” “its determination that defendant was the proximate cause of plaintiffs disability [was] firmly grounded.” (McKay v Ciani, 288 AD2d 587, 591 [3d Dept 2001]; but see Blakesley v State of New York, 289 AD2d 979, 980 [4th Dept 2001] [“no credible medical evidence that (plaintiff) is permanently disabled”].)
Front pay awards are more common in federal civil rights litigation. The United States Supreme Court has defined “front pay” as “simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement ... In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of discrimination, courts have ordered front pay as a substitute for reinstatement.” (Pollard v E.I. du Pont de Nemours & Co., 532 US 843, 846 [2001].) The Court cited as an example Gotthardt v National R.R. Passenger *586 Corp. (191 F3d 1148 [9th Cir 1999]). In Gotthardt, the Ninth Circuit upheld a front pay award in a sexual harassment case. The District Court “found the required causal connection between the hostile work environment and [plaintiffs] debilitating medical condition,” post-traumatic stress disorder (at 1156). Although the plaintiff had been treated for PTSD “for a limited period [of time] before [her employer] subjected her to the hostile work environment, the district court’s finding of causation [was] plausible in light of the extensive testimony of [plaintiffs] treating psychologist and psychological expert, that the hostile environment. . . caused [plaintiffs] disability.” (Id.)
In addition, the evidence in Gotthardt supported the District Court’s conclusion that the plaintiff’s condition rendered her unable to return to work for her employer, and “prevent [ed] her from obtaining employment in another field of work,” in light of the plaintiffs doctor’s testimony that her “ongoing impairment would render her unable to perform any job.” (Id.) The appellate court upheld an award of 11 years of front pay, given the finding that the plaintiff “would be unable to work in the future and taking into account her age (59), her educational and vocational background, and, especially, her health.” (Id. at 1157; see also Padilla v Metro-North Commuter R.R., 92 F3d 117, 126 [2d Cir 1996] [upholding award of over 20 years of front pay in “unique circumstances of this case”]; Tyler v Bethlehem Steel Corp., 958 F2d 1176, 1189 [2d Cir 1992] [upholding award of 17 years of front pay].)
“[A]n award of front pay in lieu of reinstatement does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing, because the duty to mitigate damages by seeking employment elsewhere significantly limits the amount of front pay available.” (Whittlesey v Union Carbide Corp., 742 F2d 724, 728 [2d Cir 1984]; see also Gotthardt v National R.R. Passenger Corp., 191 F3d at 1157; Padilla v Metro-North Commuter R.R., 92 F3d at 125.) The duty to mitigate is also imposed by New York state courts reviewing awards under the Human Rights Law. (See Rio Mar Rest, v New York State Div. of Human Rights, 270 AD2d at 48.) The employer “bear[s] the burden of proving that the complainant did not make a diligent effort to mitigate damages.” (Matter of State Div. of Human Rights v North Queensview Homes, 75 AD2d 819, 821 [2d Dept 1980]; see also Matter of New York State Div. of Human Rights v Wackenhut Corp., 248 AD2d 926 [4th Dept 1998].) The employer must also show “the amount by which . . . available substitute *587 employment would have mitigated [plaintiffs] damages.” (Matter of Northeast Cent. School Dist. v Webutuck Teachers Assn., 121 AD2d 544, 545 [2d Dept 1986].)
Even in cases in which no award is made for lost earnings, the effect of psychological injury or emotional distress on the complainant’s ability to work is noted in the court’s assessment of a damage award for that injury or distress. (See Bronx County Med. Group v Lassen, 233 AD2d 234, 235 [1st Dept 1996] [“inability to find comparable employment ... as a result of the hostile work environment and discriminatory discharge”]; Carrier Corp. v New York State Div. of Human Rights, 224 AD2d 936, 936 [4th Dept 1996]; Morales v Cadena, 825 F2d 1095, 1100 [7th Cir 1987]; Katt v City of New York, 151 F Supp 2d 313, 370 [SD NY 2001]; Anderson v YARP Rest., Inc., 1997 WL 27043, *8,1997 US Dist LEXIS 560, *24 [SD NY, Jan. 23,1997].) In Ramirez v New York City Off-Track Betting Corp. (112 F3d 38 [2d Cir 1997]), the court found acceptable a $500,000 award for “pain and suffering” for retaliatory discharge where a plaintiff who had “long suffered from psychiatric disabilities” “which ha[s] not adversely affected his work” was “rendered unemployable for life” as a result of the discharge (see id. at 39-40, 41 n 1). “The plaintiff produced a mass of unrebutted testimony at trial that showed that he was functional before termination and non-functional thereafter.” (Id. at 41.)
Particularly worth noting are two decisions by the Third Department in 121-129 Broadway Realty v New York State Div. of Human Rights (48 AD2d 975 [1975], on rearg 49 AD2d 422 [3d Dept 1975]). In its first decision, the Court held that “[t]here should be such evidence” of mental anguish and humiliation “as would be sufficient in a common-law action,” and found that “[c]omplainant’s unsupported testimony that she was not able to seek other employment because she was hurt and emotionally upset and that she was hurt because she had been discriminated against [was] clearly insufficient to sustain the award for mental anguish.” (See 48 AB2d at 976.) Reargument was granted after the Court of Appeals rejected the common-law standard of proof (see Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 NY2d 143 [1974]), and on reargument the court found that “the record in its entirety” established that the complainant was entitled to damages for mental anguish. (See 49 AD2d at 424.)
Standards of Review
These Third Department decisions offer clear reminders of the potential for outcome determinative significance for the *588 standards of review to be applied by the courts in reviewing awards by the Commissioner, especially when those standards are applied to private actions usually governed by different standards. There is a serious question as to whether the three primary standards applied to determinations by the Commissioner — reasonable relationship to the wrongdoing, substantial evidence, and comparability — should be applied without distinction when reviewing a jury verdict in a private action. As already noted, those standards are rooted in a historical and jurisprudential deference to the expertise of the executive branch that shares only some characteristics with the deference shown to jury verdicts.
The requirement that a remedy under the Human Rights Law be comparable to remedies for similar injuries is itself comparable to the standard used to review the amount of a jury verdict, that is, whether “it deviates materially from what would be reasonable compensation.” (CPLR 5501 [c].) Indeed, the “material deviation” standard is used by courts reviewing jury verdicts in private actions under the Human Rights Law. (See Gleason v Callanan Indus., 203 AD2d at 251; Sogg v American Airlines, 193 AD2d 153, 163 [1st Dept 1993]; Fowler v New York Tr. Auth., 2001 WL 83228, *10, 2001 US Dist LEXIS 762,*32 [SD NY, Jan. 31, 2001]; Anderson v YARP Rest., 1997 WL 27043, *8, 1997 US Dist LEXIS 560, *22.) Without suggesting that the “material deviation” standard is without its own difficulties in application (see Carr v Third Colony Corp., 2001 NY Slip Op 40400[U], *2-5 [Civ Ct, Kings County]), it appéars sufficiently similar to the comparability requirement that its application in reviewing jury verdicts under the Human Rights Law should be consistent with existing case law.
The “substantial evidence” standard, however, is not fully coexistive with the standards applied in reviewing jury verdicts. The scope of review reflected in the “substantial evidence” standard has been characterized as “extremely narrow.” (See Matter of State Div. of Human Rights v City of New York, 70 NY2d 100, 106 [1987].) “Courts may not weigh the evidence or reject the Division’s determination where the evidence is conflicting and room for choice exists. Thus, when a rational basis for the conclusion adopted by the Commissioner is found, the judicial function is exhausted.” (Id. at 106.) “A practical test, employed in ascertaining whether the proof is ‘so substantial that from it an inference of the existence of the fact found may be drawn reasonably’, is found in measuring the evidence *589 against the standard of sufficiency such as to require the court to submit it as a question of fact to a jury.” (300 Gramatan Ave. Assoc, v State Div. of Human Rights, 45 NY2d 176, 181 [1978].)
It would seem that the “substantial evidence” standard closely corresponds to the standard used in determining a motion for judgment as a matter of law, and explicitly precludes the type of inquiry made in determining a motion to set aside a verdict as against the weight of the evidence. By reason of the application of the “substantial evidence” standard to agency findings, “[t]he doctrine . . . that annulment was in order where the agency’s findings were such that a jury’s verdict to the same effect ‘would be set aside by the court as against the weight of the evidence’ no longer obtain[s].” (See id. at 180 n.)
There is nothing in the statute or case law that suggests that the Legislature or the Court of Appeals intended such a drastic change as would result from, in effect, precluding review of a jury verdict to determine whether it is against the weight of the evidence. Nor does any principle or policy argue for such a result. There is no insult to the jury in recognizing that, despite its continually-proven practical wisdom in matters of common living, none of its particular collectives is likely to possess the expertise to which deference is given by the “substantial evidence” standard.
This court concludes, therefore, that the “substantial evidence” standard does not foreclose full review of a jury verdict in accordance with CPLR 4404 (a). That is not to say that decisions reviewing awards made by the Commissioner are not highly important to the review of jury verdicts, and certainly should not suggest that the strong public policy of full compensation for victims of unlawful discrimination should not guide the court’s assessment of the evidence. It merely acknowledges that courts cannot avoid their traditional, and often difficult, role in reviewing jury verdicts on weight-of-the-evidence motions.
The “reasonable relationship to the wrongdoing” standard is somewhat problematic because, although often articulated, its precise nature has not been explained. It is a standard of causation, or of blameworthiness and proportion, or of something else or many things. The paucity of decisions in private actions under the Human Rights Law leaves its application to review of jury verdicts even more uncertain. Based on its review of the cases, this court concludes that it is at least a standard of causation, and that as such it is no less favorable to claimants than *590 the traditional tort rules, including those applied to the analogous area of workplace disabilities, but recognizing, again, the deference given by the courts in reviewing agency determinations in that area.
Causation
Assuming a prima facie showing, it is for the jury to determine legal cause. (See Ziecker v Town of Orchard Park, 75 NY2d 761, 762-763 [1989].) “The weight to be accorded [to] the opinions rendered by the . . . experts on the issue of causation [is] for the jury to determine.” (Markowitz v Johnson & Sons, 182 AD2d 742, 743 [2d Dept 1992]; see also McDonald v We’re Assoc. Co., 290 AD2d 422, 423 [2d Dept 2002].) On the issue of causation, as on the other issues that are the subject of expert opinion, “[i]t [is] within the province of the jury to resolve issues of conflicting expert testimony.” (See Sozzi v Gramercy Realty Co. No. 2, 304 AD2d 555, 557 [2d Dept 2003]; see also Stelmach v 650 Fifth Ave. Co., 290 AD2d 434, 435 [2d Dept 2002].)
“The causation rule both in tort law and under the workers’ compensation statute is that an accident which produces injury by precipitating the development of a latent condition or by aggravating a preexisting condition is a cause of that injury.” (Tobin v Steisel, 64 NY2d 254, 259 [1985]; see also Pacella v Masone, 262 AD2d 291, 292 [2d Dept 1999].) The rule reflects the “old axiom that a defendant must take a plaintiff as he finds him.” (Bartolone v Jeckovich, 103 AD2d 632, 635 [4th Dept 1984].) And so, where a plaintiff, “although apparently suffering from a quiescent psychotic illness, was able to function in a relatively normal manner” until a “minor accident aggravated his schizophrenic condition leaving him totally and permanently disabled,” the Court sustained a substantial jury verdict in his favor for the illness. (Id. at 635.) Such a plaintiff might be characterized as “a ‘mental eggshell’ ready to be cracked.” (See Bialik v Dupont de NeMours & Co., 142 Misc 2d 926, 929 [Sup Ct, Niagara County 1988].) The principle will apply even when the precipitating or aggravating factor is not physical, sudden or otherwise, as in the case of harassment. (See Poole v Copland, Inc., 348 NC 260, 264, 498 SE2d 602, 604 [1998] [sexual harassment]; Pieczynski v Duffy, 875 F2d 1331, 1336 [7th Cir 1989] [political harassment]; see, generally, Stanley J. McQuade, The Eggshell Skull Rule and Related Problems in Recovery for Mental Harm in the Law of Torts, 24 Campbell L Rev 1 [2001].)
In the context of the workplace, workers’ compensation awards may be based on mental or psychological injury, even if *591 workplace conditions “precipitated a latent condition or aggravated a preexisting emotional instability.” (See Matter of Kaliski v Fairchild Republic Co., 151 AD2d 867, 868 [3d Dept 1989], affd 76 NY2d 1002 [1990]; see also Altes v Petrocelli Elec. Co., 270 AD2d 767, 769 [3d Dept 2000]; Whitton v Spinnato, 143 AD2d 274, 275 [2d Dept 1988].) “The causal relationship between an industrial accident and a resulting mental condition need not be direct and immediate. Rather, it is sufficient that the work stress be a ‘contributing cause’ of the psychic injury.” (Matter of Friedman v NBC Inc., 178 AD2d 774, 775-776 [3d Dept 1991] [citation omitted].) Harassment may be such a contributing cause. (See Kaliski v Fairchild Republic Co., 151 AD2d at 867 [“disparaging racial remarks and taunt(ing) . . . concerning (the plaintiffs) inability to have children”]; CookSchoonover v Corning Hosp., 291 AD2d 715, 715 [3d Dept 2002] [“verbal . . . harassing work environment”]; Beames v Warren County Sheriff’s Dept., 190 AD2d 877, 877 [3d Dept 1993] [“constant harassment and taunting”]; see, generally, Emmanuel S. Tipon, Right to Workers’ Compensation for Emotional Distress or Like Injury Suffered by Claimant as Result of Non-sudden Stimuli — Requisites Of, and Factors Affecting, Compensability, 106 ALRSth 111 [2003].)
A workers’ compensation award for mental or psychological injury will be upheld when based upon “substantial evidence . . . supporting] the Board’s finding that the claimant’s disability was causally related to an accident arising out of and in the course of his employment.” (Beames v Warren County Sheriff’s Dept., 190 AD2d at 879; Kessler v Fairmont Theater, 262 AD2d 888, 889 [3d Dept 1999]; Whitton v Spinnato, 143 AD2d at 275 [“wholly irrational”].) On the other hand, “[although the fact that [the plaintiff] had latent psychotic tendencies would not defeat recovery if the accident was a precipitating cause of schizophrenia, this may have a significant bearing on damages. The defendants are entitled to explore the probability that the [plaintiff] may have developed schizophrenia in any event.” (Steinhauser v Hertz Corp., 421 F2d 1169, 1173 [2d Cir 1970]; see also Doyle v American Home Prods. Corp., 286 AD2d 412, 413-414 [2d Dept 2001]; Roy v Hartogs, 85 Misc 2d 891, 893-894 [App Term, 1st Dept 1976].)
[The court reviews the general requirements for the validity and probative value of opinion evidence.]
A claim for lost earnings must be established with “reasonable certainty,” which requires “competent medical evidence *592 that [plaintiff] was unable to work because of injuries” for which the defendant is responsible. (Szynalo v Barretti Carting Corp., 304 AD2d 558, 559 [2d Dept 2003]; see also Razzaque v Krakow Taxi, 238 AD2d 161, 162 [1st Dept 1997]; Colezetti v Pircio, 214 AD2d 926, 928 [3d Dept 1995]; Easley v City of New York, 189 AD2d 599, 601 [1st Dept 1993]; Byrd v New York City Tr. Auth., 172 AD2d 579, 581 [2d Dept 1991]; compare Placakis v City of New York, 289 AD2d 551, 553 [2d Dept 2001] [“The only medical evidence at trial was that of the plaintiffs’ expert, . . . who testified that the injured plaintiff was totally disabled”].)
The Jury’s Verdict
As noted above, the jury awarded Ms. Boodram a total of $798,000 in damages, comprised of $86,000 for mental suffering, emotional and psychological injury through trial, $234,000 for loss of earnings through trial, $86,000 for mental suffering, emotional and psychological injury for 14 years beyond trial, and $392,000 for loss of earnings for 14 years beyond trial.
With the exception of the computation of the jury’s award for future loss of earnings, the court concludes that the jury’s awards bear a reasonable relationship to the wrongdoing, are supported by substantial evidence, and are comparable to similar awards for similar injuries. The court cannot say that there is no valid line of reasoning and permissible inferences that could possibly lead rational people to the jury’s awards on the basis of the evidence presented at trial, and cannot say that the jury could not have determined the awards on any fair interpretation of the evidence.
The Center has identified a number of, what it would characterize as, exaggerations, inaccuracies or inconsistencies in Ms. Boodram’s testimony. The court has considered these, but concludes that they do not require that the jury’s awards for damages be set aside. There is, without question, a substantial difference between the two incidents of inappropriate touching noted in Dr. San Giovanni’s notes of her initial session with Ms. Boodram and the numerous incidents that Ms. Boodram testified to at trial. But there was also the testimony of two of Ms. Boodram’s former coworkers, identifying four witnessed incidents of inappropriate touching. In light of the commonsense notion that Mr. Adiego was more likely to engage in that kind of behavior when others would not be able to observe it, either the witnesses’ observations were extraordinarily coincidental, or there were more than four such incidents.
Perhaps more importantly, Dr. San Giovanni’s opinions as to the effects of Mr. Adiego’s behavior on Ms. Boodram were based *593 upon the two incidents of touching that she noted, which suggests that the stalking of Ms. Boodram itself produced the serious and continuing harm that Dr. San Giovanni described. A further reasonable inference is that additional incidents of inappropriate touching would result in greater harm. In no event would a jury’s finding that more than two incidents took place — a finding that would be justified by the testimony — lead to an inference or conclusion that Ms. Boodram suffered less harm than that described by her psychiatrist.
Even if a conclusion were justified that Ms. Boodram had seen a mental health professional before June 1992, the evidence at trial provides no basis for relieving the Center of responsibility for the harm caused by Mr. Adiego. Except for Ms. Boodram’s testimony at her deposition that she had sought help for a job-related problem unrelated to Mr. Adiego, there was no evidence of a prior psychiatric history or that Ms. Boo-dram suffered from any psychological disorder prior to June 1992. All of the testimony — including that from her supervisors, the deputy director, and a human resources professional, who would have been in a position to testify otherwise — was that she was happy and successful in the workplace in which she had labored for almost two decades. There was no evidence even of a condition that had been “precipitated” or “aggravated” by Mr. Adiego’s behavior, and, in light of the extensive authority discussed above, no basis for saying that Mr. Adiego’s behavior and the Center’s response did not cause the harm that the jury found to exist.
The amount of the award for mental suffering, emotional and psychological harm through trial, $86,000, compensating Ms. Boodram for the approximately four months that she was directly subject to the hostile work environment and the approximately 10 years thereafter, is clearly within the range of awards for similar injuries and supported by a fair interpretation of the evidence. In light of all the evidence, the two-year gap between her last visit to Dr. San Giovanni and the date of trial is of little significance.
As to lost earnings through trial, it is certainly noteworthy that at her deposition Ms. Boodram identified her physical injuries when asked why she did not return to work. But, again, the significance is minimal in light of testimony that, at the time, she told a coworker that it was because of the situation with Mr. Adiego, and, more importantly, the November 1992 report of a psychiatrist that severe and disabling stress required that she stop work immediately.
*594 Crucial to establishing a sufficient causal connection between the environment at the Center and Ms. Boodram’s failure to even look for work since 1992 are the opinions of Dr. San Giovanni. Those opinions, revealed by her testimony, treatment notes, and other reports, if believed by the jury, as they obviously were, support a finding that Ms. Boodram could not work for all or a substantial part of the time from 1992 through trial. To the extent that the Center demonstrated that Ms. Boodram may not have revealed certain information to Dr. San Giovanni, it did not elicit from the doctor any statement that the information would have affected her opinions.
The jury was free to accept Dr. San Giovanni’s opinions over those of Dr. Helperin. But even Dr. Helperin diagnosed depression and other psychological disorders, consistent in part with Dr. San Giovanni’s diagnosis. Dr. Helperin’s opinion that those conditions would not prevent Ms. Boodram from working was based upon having been told by Ms. Boodram that she helped her husband (who is employed by the City) with a home jewelry business. But, particularly in light of Dr. San Giovanni’s opinions to the contrary, the jury could conclude that the ability to work at home in some unspecified and unquantified manner does not establish the ability to keep a job in the workplace. The Center introduced no evidence, other than Dr. Halperin’s opinion, that Ms. Boodram was capable of working outside the home, or the economic value of any work she might do at home, and, as shown above, the Center bore the burden on mitigation.
[The court rejects the Center’s contention that “Plaintiffs testimony by itself is not sufficient to prove the amount of her lost income” and that her “failure to produce any corroborative documentation rendered any calculation of lost income completely speculative,” and determines that any jury confusion during its deliberations was remedied by further instruction.]
Whatever the precise nature and extent of the jury’s confusion, it seems reasonably clear that it related to the questions related to mental, emotional and psychological injury and the period of years, rather than those related to the loss of future earnings. The jury note concerning the difficulty in reaching an agreement on future earnings shows that the jury understood that the essential issue was whether or not Ms. Boodram was “permanently disabled.” The jury’s first verdict was unanimous on that issue, and, assuming that the award is otherwise sustainable, the jury’s intent to provide compensation until Ms. Boodram is 62 years old is reasonable. As the discussion of *595 authorities demonstrates, although awards for future lost earnings for such periods of time are not common, they are not unheard of.
The amount awarded as damages for future mental, emotional and psychological injury (assuming, again, that the award is otherwise sustainable) is within the range of awards sustained in other cases, whether considered separately or in combination with the amount awarded for the period through trial. The 14-year period ultimately specified (and, apparently, initially determined) is reasonable and consistent with the award for future earnings.
Are, then, either of the awards for future damages sustainable without evidence of continuing psychiatric treatment, and, therefore, Ms. Boodram’s condition, at the time of trial? Any award for future earnings, including the much more common award for physical injuries, is to some extent speculative. In a case involving physical injuries, the Court of Appeals recently held that a doctor’s opinion as to the permanency of the injuries could provide sufficient support for a finding of permanency, even though the doctor last examined the plaintiff four years prior to the trial. (See Toure v Avis Rent A Car Sys., 98 NY2d 345, 355 [2002].)
The court is unaware of any legal authority that would require a different rule for mental, emotional or psychological harm, and there was no evidence that, as a general matter, opinion as to the permanency of such injuries is any more suspect than opinion as to the permanency of physical injuries. Once the jury credited Dr. San Giovanni’s diagnosis of post-traumatic stress disorder with secondary depression, there was no expert testimony to contradict her further opinion that Ms. Boodram’s condition is both permanent and disabling. And, as the discussion of legal authorities demonstrates, New York and federal courts have sustained awards for future damages, both distress and lost earnings, when based upon evidence of post-traumatic stress disorder.
Even when an award of future lost earnings is based upon sufficient evidence “regarding the plaintiff’s physical condition,” “the award may be set aside when it deviates materially from what would be reasonable compensation.” (Balsam v City of New York, 298 AD2d 479, 480 [2d Dept 2002]; CPLR 5501 [c].) To the extent that the “material deviation” standard calls for a comparison with verdicts sustained in similar cases (see Carr v Third Colony Corp., 2001 NY Slip Op 40400[U], *3-4), there is little available in the New York cases.
*596 This court has noted that there is no New York decision upholding an award for future lost earnings in a discrimination action under the Human Rights Law. But the court is unaware of any decision suggesting that such an award would not be appropriate if otherwise supported by sufficient evidence. Again, there is sufficient authority among the decided cases, even if not substantial in number, to provide the foundation for sustaining the award here, particularly in light of the strong policies of the Human Rights Law. The absence of traumatic physical injury or an explicit finding of constructive discharge (which was not requested in this case) should not preclude an award for damages otherwise sufficiently established as causally related to the wrongdoing.
In one respect, however, the jury’s award for loss of earnings in the future cannot be sustained. Based upon Ms. Boodram’s last salary ($25,000), and without any evidence to support an upward adjustment, the maximum award for the 14 years for which the jury intended to provide compensation would be $350,000, rather than the $392,000 awarded by the jury.
Therefore, the Center’s motion for a new trial is granted as to damages only, unless, within 30 days after service upon her of a copy of this decision and order with notice of entry, plaintiff serves and files in the office of the clerk a written stipulation consenting to a reduction of the jury’s award for loss of earnings in the future from $392,000 to $350,000.
[Portions of opinion omitted for purposes of publication.]